Matthew G. Monforton  (Montana Bar # 5245)
Monforton Law Offices, PLLC
32 Kelly Court
Bozeman, Montana 59718
Telephone:  (406) 570-2949
E-mail:      matthewmonforton@yahoo.com

Attorney for Plaintiff

# UNITED STATES DISTRICT COURT
## DISTRICT OF MONTANA

| | |
|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, INC.,<br><br>          Plaintiff,<br><br>     v.<br><br>JONATHAN MOTL, in his official capacity as the Commissioner of Political Practices for the State of Montana; TIMOTHY C. FOX, in his official capacity as Attorney General for the State of Montana; LEO GALLAGHER, in his official capacity as County Attorney for the County of Lewis & Clark,<br><br>          Defendant. | Case No: CV 16-00023-H-DLC<br><br>**BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br><br>**\*Relief Requested by May 15, 2016** |

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES**................................................................iv

**INTRODUCTION** ........................................................................1

**STATEMENT OF FACTS** ...........................................................3

I    NAGR'S BACKGROUND AND HISTORY ................................3

II   THE COMMISSIONER SEEKS TO IMPERMISSIBLY
REGULATE NAGR'S ISSUE ADVOCACY...................................4

III  THE NEW REGULATIONS ON POLITICAL SPEECH
IMPOSED BY SB-289 ..................................................................5

IV  NAGR'S CONCERNS ABOUT THE COMMISSIONER
APPLYING SB-289 TO BURDEN ITS POLITICAL
SPEECH .....................................................................................9

**ARGUMENT** ............................................................................10

I    THE TUTVEDT MAILER WAS NOT EXPRESS ADVOCACY
AND THEREFORE DID NOT TRIGGER DISCLOSURE
OBLIGATIONS UNDER MONTANA'S 2012 ELECTION
LAWS .......................................................................................10

II   MONTANA'S REGULATION OF "ELECTIONEERING
COMMUNICATION IS SUBSTANTIALLY OVERBROAD ......13

III  MONTANA'S COMPELLED-VOTE-REPORTING PROVISION
IS UNCONSTITUTIONAL ........................................................18

      A. The Compelled-Vote-Reporting Provision is Subject to Strict
         Scrutiny Because It Compels Speech .......................................18

      B. The Compelled-Vote-Reporting Provision is Also Subject to
         Strict Scrutiny Because It is a Content-Based Restriction on
         Speech......................................................................................20

C. Montana's Compelled-Vote-Reporting Provision Cannot Survive Strict Scrutiny Because Insulating Legislators From Criticism is Not a Compelling Interest ........................................................21

IV   NAGR IS ENTITLED TO A PRELIMINARY INJUNCTION ......................23

A. NAGR is Likely to Succeed on the Merits ....................................................23

B. NAGR Will Suffer Irreparable Harm if Relief is not Granted ........................................................................................24

C. The Balance of Equities Tips Sharply in NAGR's Favor .........................25

D. Enjoining the Statute is in the Public Interest ...........................................26

**CONCLUSION** ...............................................................................26

# TABLE OF AUTHORITIES

## Cases:

*Agency for International Development v. Alliance for Open
Society International, Inc.*,
   133 S.Ct. 2321 (2013).........................................................................18, 20

*Alliance for the Wild Rockies v. Cottrell*,
   632 F.3d 1127, 1131 (9th Cir. 2011) ..............................................24

*Arizona Right to Life PAC v. Bayless*,
   320 F.3d 1002 (9th Cir. 2003) .....................................................20, 21

*Buckley v. Valeo*,
   424 U.S. 1 (1976)................................................................1, 10, 14

*Canyon Ferry Road Baptist Church v. Unsworth*,
   556 F.3d 1021 (9th Cir. 2009) .......................................................22

*Citizens United v. FEC*,
   558 U.S. 310 (2000)......................................................13, 14, 21

*Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*,
   657 F.3d 936 (9th Cir. 2011) ..........................................................13

*Elrod v. Burns*,
   427 U.S. 347 (1976)...........................................................................24

*FEC v. Mass. Citizens for Life, Inc. (MCFL)*,
   479 U.S. 238 (1986)...........................................................................15

*FEC v. Wisconsin Right to Life*,
   551 U.S. 449 (2007).......................................................5, 10-11, 14

*Human Life of Washington, Inc., v. Brumsickle*,
   624 F.3d 990 (9th Cir. 2010) ....................................................14, 16

*Jacobs v. Clark County School Dist.*,
   526 F.3d 419 (9th Cir. 2008) ...................................................20-21

iv

*Joelner v. Washington Park*,
378 F.3d 613 (7th Cir. 2004) ...........................................................................26

*Knox v. SEIU, Local 1000*,
132 S.Ct. 2277 (2012)......................................................................................19

*Lair v. Murry*,
871 F. Supp. 2d 1058 (D. Mont. 2012)..............................................................8

*Miami Herald Publishing Co. v. Tornillo*,
418 U.S. 241 (1974).........................................................................................19

*Minnesota Citizens Concerned for Life, Inc. v. Swanson*,
692 F.3d 864 (8th Cir.2012) ............................................................................15

*Monforton v. Motl*,
CV 14-2-H-DLC (D. Mont. Feb. 11, 2014)........................................................8

*Monterey Mechanical Co v. Wilson*,
125 F.3d 702 (9th Cir. 1997) ...........................................................................24

*Reed v. Town of Gilbert*,
135 S.Ct. 2218 (2015)......................................................................................20

*Riley v. National Federation of the Blind*,
487 U.S. 781 (1988).........................................................................................22

*Sammartano v. First Judicial Dist. Court*,
303 F.3d 959 (9th Cir. 2002) ...........................................................................25

*Sanders County Republican Cent. Comm. v. Bullock*,
698 F.3d 741 (9th Cir. 2012) ...........................................................................25

*Stormans, Inc. v. Selecky*,
586 F.3d 1109 (9th Cir. 2009) .........................................................................24

*Thalheimer v. City of San Diego*,
645 F.3d 1109 (9th Cir. 2011) .........................................................................25

*Toledo Area AFL-CIO Council v. Pizza,*
      154 F.3d 307 (6th Cir. 1998) ................................................... 19-20

*United States v. Alvarez,*
      132 S.Ct. 2537 (2013)...............................................................22

*United States v. Playboy Entertainment Group, Inc.,*
      529 U.S. 803 (2000)...................................................................22

*West Virginia Board of Education v. Barnette,*
      319 U.S. 624 (1943)...................................................................18

*Winter v. Natural Res. Def. Council, Inc.,*
      129 S.Ct. 365, 374 (2008).........................................................23

*Wisconsin Right to Life, Inc. v. Barland,*
      751 F.3d 804 (7th Cir. 2014) ...........................................13, 15, 17

*Wooley v. Maynard,*
      430 U.S. 705 (1977)...................................................................19

## Statutes & Rules:

MONTANA CODE ANNOTATED
      § 13-1-101(11) (2013) ...............................................................10
      § 13-1-101(14) .............................................................................5
      § 13-1-101(15) ....................................................................... 5-6, 17
      § 13-1-101(22) .............................................................................8
      § 13-1-101(23) .............................................................................8
      § 13-1-101(30) .............................................................................6
      § 13-1-101(47) .............................................................................5
      § 13-13-205(2) .............................................................................6
      § 13-35-225(3) .............................................................2, 8, 18, 21
      § 13-37-128...................................................................................9
      § 13-37-201...................................................................................7
      § 13-37-203...................................................................................7
      § 13-37-205...................................................................................7
      § 13-37-207...................................................................................7
      § 13-37-208...................................................................................7

§ 13-37-226..................................................................................................7
§ 13-37-228..................................................................................................8
§ 13-37-232..................................................................................................8

ADMINISTRATIVE RULES OF MONTANA
44.10.323(4)................................................................................................12
44.10.405 .....................................................................................................7
44.10.501 .....................................................................................................7
44.10.503 .....................................................................................................7
44.11.605(2)..................................................................................................6

## INTRODUCTION

Plaintiff National Association For Gun Rights, Inc. ("NAGR") seeks to enjoin Defendant Jonathan Motl, Montana's Commissioner of Political Practices (the "Commissioner"), from regulating traditional issue advocacy speech and to further enjoin the Commissioner from applying provisions of SB-289, a campaign finance bill enacted by the Montana Legislature which became effective on October 1, 2015.

It has been long-settled that issue advocacy speech, *i.e.*, speech that does not advocate for or against a candidate for office, is not subject to regulation and is protected by the First Amendment.  This issue was settled in *Buckley v. Valeo*, 424 U.S. 1 (1976) and has been repeatedly re-affirmed in subsequent Supreme Court cases over the past forty years.  Yet legislatures, such as Montana's, have sought to curb these First Amendment freedoms by enacting statutes, like SB-289, that create new burdens for speakers who simply desire to talk about matters of public concern.

NAGR seeks injunctive and declaratory relief arising from a mailer it sent to Flathead County residents in 2012.  The mailer was traditional issue advocacy and did not contain any appeal to residents to vote for or against a candidate for public office and was therefore not subject to regulation under Montana's then-existing laws.  Nevertheless, the Commissioner recently determined that NAGR should

have registered as a political committee when it distributed the 2012 mailers.

NAGR intends to make similar communications during the upcoming election

cycle.   NAGR therefore seeks relief from this Court regarding the Commissioner's

upcoming efforts to seek civil penalties against NAGR for this type of traditional

issue advocacy mailing.

    In addition to this overreach by the Commissioner, SB-289 imposes

burdensome political committee regulations on groups whose communications do

not include appeals to vote for or against candidates for public office—thus

impermissibly regulating traditional issue advocacy.  These regulations are

substantially overbroad and violate the First Amendment.

    NAGR also challenges another portion of SB-289 requiring communications

that include information about a candidate's voting record to also include "a

reference to the particular vote or votes upon which the information is based" and

"a disclosure of all votes made by the candidate on the same legislative bill or

enactment."  Mont. Code Ann. § 13-35-225(3).  This provision unconstitutionally

compels speech by anyone desiring to criticize an incumbent's voting record and,

in reality, is little more than an incumbent protection act.

    The challenged provisions of SB-289 impose significant burdens upon

NAGR's First Amendment right to speak to Montana citizens concerning their

constitutional right to keep and bear arms.  NAGR desires to make such

communications without having to comply with Montana's unconstitutional

demands and is thus requesting relief from this Court no later than May 15, 2016.

## STATEMENT OF FACTS

### I. NAGR'S BACKGROUND AND HISTORY

NAGR was incorporated as a non-profit corporation in 2000 under the laws

of the Commonwealth of Virginia.  (Verified Complaint, ¶ 19.)   It is a grassroots

organization whose mission is to "defend the right to keep and bear arms from all

of its enemies, and advance those God-given rights by educating the American

people and urging them to action in the public policy process." (*Id.*, ¶ 20.)  It has

36,000 members and supporters in Montana and 4.5 million members in the United

States. (*Id.,* ¶ 25.)

NAGR's mission is to defend American's Second Amendment "right to

keep and bear arms" and to educate the public on issues related to the Second

Amendment so that the public may participate meaningfully in dialogue and debate

about the "right to keep bear arms." (Verified Complaint, ¶ 21.)  An important part

of NAGR's activities is letting the public know where legislators and governmental

officials stand on issues related to the Second Amendment and the "right to keep

and bear arms." (*Id.,* ¶ 21.)  NAGR also performs other acts necessary or

incidental to the above and does whatever it deems necessary, useful, advisable, or

conducive, directly or indirectly, to carry out any of the purposes of the corporation, as set forth in its articles of incorporation, including the exercise of all other powers and authority enjoyed by non-profit corporations generally.  (*Id.,* ¶ 21.)

NAGR is exempt from federal income taxes as a social welfare organization under 26 U.S.C. § 501(c)(4).  (Verified Complaint, ¶ 22.)  Organizations under 501(c)(4) must be "primarily engaged in promoting in some way the common good and general welfare of the people of the community."  26 C.F.R. § 501(c)(4).  Further, "[t]he promotion of social welfare does not include direct or indirect participation or intervention in political campaigns on behalf of or in opposition to any candidate for public office."  *Id*.  NAGR is in compliance with this requirement, and will remain so in the future.  (Verified Complaint, ¶ 24).

## II.   THE COMMISSIONER SEEKS TO IMPERMISSIBLY REGULATE NAGR'S ISSUE ADVOCACY

Despite NAGR's refusal to intervene in political campaigns to support or oppose the election of candidates for public office, the Commissioner recently alleged that NAGR did so in 2012 during the primary election in Montana's Senate District 3 (SD-3).  (See generally, Exhibit 2 to Verified Complaint.)  In 2012, NAGR sent to SD-3 residents a mailer (hereinafter, the "Tutvedt Mailer") informing them that state Senator Bruce Tutvedt voted against a bill that would have facilitated the construction of a smokeless powder plant in Flathead County.

4

(Verified Complaint, ¶ 3; *id.*, Exhibit 1.).  The Tutvedt Mailer suggested that

Flathead residents contact Sen. Tutvedt and demand an apology from him for

voting against the bill.   (*Id.*, Exhibit 1.)  The mailer did not contain an appeal to

Flathead residents to vote for or against Sen. Tutvedt in the upcoming primary.

(*Id.*)  Nevertheless, the Commissioner intends to seek civil penalties against NAGR

for sending the Tutvedt Mailer without reporting its costs.  (*Id.*, Exhibit 2.)


III.   THE NEW REGULATIONS ON POLITICAL SPEECH IMPOSED BY
       SB 289

The Montana Legislature enacted SB-289 in 2015, a campaign-finance bill

that included several new regulations on political speech.  Prior to 2015, Montana

limited its regulation of communications to those "susceptible of no reasonable

interpretation other than as an appeal to vote for or against a specific candidate."

*Graybill v. Western Tradition Partnership & Coalition for Energy & Environment*,

p. 34,[1] quoting *Wisconsin Right to Life, Inc. v. FEC,* 551 U.S. 449, 469-70 (2007)

("*WRTL*").  Such speech is referred to by federal courts as "express advocacy,"[2]

and is defined by SB-289 as "election communications."  § 13-1-101(14) and (47),

MCA.  NAGR does not intend to make any election communications.

---

[1] The Commissioner's ruling in *Graybill* is posted on his website at
<politicalpractices.mt.gov/content/2recentdecisions/GraybillvWTPandCoalitionfor
EnergyandEnvironmentDecision>

[2] *WRTL,* 551 U.S. at 470.

SB-289 expands the Commissioner's jurisdiction beyond express advocacy by creating a new category of speech subject to regulation: "electioneering communications" § 13-1-101(15), MCA, which are a form of issue advocacy.[3] Now, any group that merely mentions the name of a Montana candidate, or a political party, within 105 days[4] of most elections makes an "electioneering communication" and must register as a political committee if it spends more than $250 on the communication. § 13-1-101(30)(a) and (d), MCA.

---

[3] Section 13-1-101(15), MCA, states in pertinent part:

(a) "Electioneering communication" means a paid communication that is publicly distributed by radio, television, cable, satellite, internet website, newspaper, periodical, billboard, mail, or any other distribution of printed materials, that is made within 60 days of the initiation of voting in an election, that does not support or oppose a candidate or ballot issue, that can be received by more than 100 recipients in the district voting on the candidate or ballot issue, and that:
   (i) refers to one or more clearly identified candidates in that election;
   (ii) depicts the name, image, likeness, or voice of one or more clearly identified candidates in that election; or
   (iii) refers to a political party, ballot issue, or other question submitted to the voters in that election.

[4] The Commissioner has interpreted the phrase "within 60 days of the initiation of voting" in § 13-1-101(15), MCA, to mean 60 days before the date in which absentee ballots are mailed to electors. Rule 44.11.605(2)(a), ARM. The State mails absentee ballots to military and overseas electors no later than 45 days in advance of an election. § 13-13-205(2), MCA. Thus, for most elections, Montana regulates electioneering communications for a 105-day period before Election Day rather than a 60-day period.

All Montana political committees must comply with the following

regulations:

- File a Statement of Organization. § 13-37-201, MCA.  This includes the
  name and address of the committee, the names and addresses of affiliated
  political committees, the complete names, addresses and titles of its officers,
  and the name, office sought, and party affiliation of each candidate (or
  ballot) the committee is supporting or opposing; § 13-37-201, MCA; Rule
  44.10.405, ARM. The statement must be filed within five days of the
  committee's first expenditure.  § 13-37-201, MCA.

- Appoint a treasurer. § 13-37-201, MCA.  Treasurers must keep "detailed
  accounts" of the committee's contributions and expenditures.  § 13-37-208,
  MCA.  These accounts must be maintained "as prescribed and published in
  manual form by the Commissioner."  Rule 44.10.501, ARM.  All committee
  accounts, together with all reports filed with the Commissioner, must be kept
  for at least four years.  § 13-37-208(3), §13-37-231(2), MCA.  All
  committee deposits and expenditures must be made through its treasurer.
  Rule 44.10.503, ARM.  Treasurers must be registered to vote in Montana.  §
  13-37-203, MCA.

- Establish a separate bank account for the political committee.  § 13-37-205,
  MCA.  This account must be used for all of the committee's contributions
  and expenditures.  *Id.*  All contributions must be deposited in the account
  within five days of receipt.  § 13-37-207, MCA.  The committee's account
  must be in a bank authorized to transact business in Montana. § 13-37-205,
  MCA.

- File periodic reports.  §13-37-226, MCA.  Periodic reports must be filed
  "even though no contributions or expenditures may have been received or
  made during the period." § 13-37-228, MCA.

In addition to the requirements stated above, SB-289 requires disclosure of

the identities of a committee's contributors.  A political committee whose major

purpose is to accept contributions and make expenditures, referred to as an

"independent committee," must identify all of its contributors who give $35 or

7

more to the committee.  §§ 13-37-101(23), 13-37-229(1), MCA.  A political

committee that does not support or oppose candidates as its major purpose, defined

as an "incidental committee," must nevertheless identify all contributors whose

contributions are (1) earmarked for communications supporting a specific

candidate or (2) made in response to an appeal by the incidental committee for

contributions to support its "election activity."  §§ 13-1-101(22), 13-37-232(1),

MCA.

NAGR is also challenging Montana's Compelled-Vote-Reporting Provision.

This Court invalidated a prior version of the provision in 2012.  See *Lair v. Murry*,

871 F. Supp. 2d 1058, 1063-64 (D. Mont. 2012).  The Montana Legislature revised

it in 2013, resulting in this Court striking it down again in 2014.  See *Monforton v.*

*Motl*, CV 14-2-H-DLC (D. Mont. Feb. 11, 2014) (Doc. 26).  The Legislature

revised it again in 2015 as part of SB-289.[5]

---

[5] The latest version of the Compelled-Vote-Reporting Provision, § 13-35-225(3)(a), states as follows:

> Printed election material described in subsection (1) that includes information about another candidate's voting record must include the following:
> (i)  a reference to the particular vote or votes upon which the information is based;
> (ii)  a disclosure of all votes made by the candidate on the same legislative bill or enactment; and
> (iii) a statement, signed as provided in subsection (3)(b), that to the best of the signer's knowledge, the statements made about the other candidate's voting record are accurate and true.

Violations of these rules may result civil penalties in an amount up to $500 or three times the amount of an unlawful contribution or expenditure, whichever is greater.  § 13-37-128, MCA.

IV.   NAGR'S CONCERNS ABOUT MONTANA'S
       UNCONSTITUTIONAL REGULATION OF ITS SPEECH

Some Montana officeholders inaccurately claim to support the rights of citizens to keep and bear arms as well as to engage in lawful self-defense. (Verified Complaint, ¶ 26.)  NAGR informs citizens of the identities of these officeholders and provides information about their voting records.  (*Id.,* ¶ 27.)

If permitted to do so without being subject to Montana's political committee regulations, NAGR intends to mail informational literature to Montanans describing the failures of various Montana officeholders to support the rights of citizens to keep and bear arms and engage in lawful self-defense.  (Verified Complaint, ¶ 29.)   (A true and correct copy of the front and back sides of a postcard typical of the kind of literature NAGR intends to mail is attached as **Exhibit 1** to the Verified Complaint).

NAGR is concerned, however, that its anticipated mailings will trigger enforcement by the Commissioner concerning "electioneering communications," which in turn will trigger Montana's political committee regulations.  (Verified Complaint, ¶ 34.)  NAGR intends to mail its informational literature throughout the

year if it obtains injunctive relief from this Court and desires to do so no later than May 15, 2016. (*Id.,* ¶ 31.) It has not and will not do so, however, as long as it remains subject to the unconstitutional provisions of SB-289 that it challenges in this action. (*Id.,* ¶ 35.)

## ARGUMENT

I   THE TUTVEDT MAILER WAS NOT EXPRESS ADVOCACY AND THEREFORE DID NOT TRIGGER DISCLOSURE OBLIGATIONS UNDER MONTANA'S 2012 ELECTION LAWS

Prior to 2015, Montana had defined "expenditure" under its campaign finance law as "a purchase, payment, distribution, loan, advance, promise, pledge, or gift of money or anything of value made for the purpose of *influencing the results of an election*." § 13-1-101(11)(a), MCA (2013) (emphasis added). The Supreme Court, however, has held such language in other campaign-finance statutes to be unconstitutionally vague and overbroad. *Buckley*, 424 U.S. at 79-80. The Court therefore construed the phrase "influencing the result of an election" to be limited to "communications that expressly advocate the election or defeat of a clearly identified candidate." *Id.* at 80. It has since refined this rule as follows:

> [A] court should find that an ad is the functional equivalent of express advocacy only if the ad is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate.

*WRTL*, 551 U.S. at 470. The Court in *WRTL* created a safe harbor for speakers desiring to discuss policy issues without fear of their communications being

regulated as express advocacy.  Communications are "plainly not the functional equivalent of express advocacy" if they (1) "focus on a legislative issue, take a position on the issue, exhort the public to adopt that position, and urge the public to contact public officials with respect to the matter" and (2) "do not mention an election, candidacy, political party, or challenger and they do not take a position on a candidate's character, qualifications, or fitness for office." *Id.*

Apparently cognizant of the constitutional infirmities in Montana's pre-2015 election law, which applied to any communication that was made "for the purpose of influencing an election," § 13-1-101(11)(a), MCA (2013), the Commissioner followed the Supreme Court's lead and defined "expenditure" under Montana law in accordance with *WRTL*.  See, *e.g.*, *Graybill v. Western Tradition Partnership & Coalition for Energy & Environment*, p. 34, quoting *WRTL,* 551 U.S. at 469-70.

The Commissioner will soon seek penalties against NAGR because it did not file as a political committee and report the monies it spent in distributing the Tutvedt Mailer during the in 2012 primary election.  (Verified Complaint, Exhibit 2).  The Tutvedt Mailer, however, clearly falls within the safe harbor created by *WRTL* and therefore cannot be deemed an "expenditure" under Montana campaign-finance law as it existed in 2012.  First, the Tutvedt Mailer focused upon a legislative issue: the construction of smokeless powder plants in Montana.  (*Id.*, Exhibit 1.)  The Mailer contained language strongly supportive of the construction

11

of such plants, exhorted the public to adopt this position, and urged the public to contact Sen. Tutvedt regarding the issue.  (*Id*.)  Second, the Tutvedt Mailer made no mention of an election, candidacy, political party, or challenger and did not take a position on Sen. Tutvedt's character, qualifications, or fitness for office.  (*Id*.)

Because the Tutvedt Mailer was not express advocacy or its equivalent, it was not an "expenditure" under the Montana campaign-finance law in existence in 2012.  NAGR therefore was not subject to Montana political committee regulations in 2012.[6]  For the same reason, the Tutvedt Mailer was not a "coordinated expenditure" as alleged by the Commissioner.  See Rule 44.10.323(4) (defining "coordinated expenditure" as "an *expenditure* made in cooperation with, consultation with, at the request or suggestion of, or the prior consent of a candidate or political committee or an agent of a candidate or political committee.") (emphasis added).  NAGR is entitled to injunctive and declaratory relief from this Court concerning the Commissioner's intended efforts to seek civil penalties against it.

---

[6]  See § 13-1-101(22), MCA (2013), which defined "political committee" as "a combination of two or more individuals or a person other than an individual who makes a contribution or *expenditure*: (a) to support or oppose a candidate or a committee organized to support or oppose a candidate or a petition for nomination; or (b) to support or oppose a ballot issue or a committee organized to support or oppose a ballot issue; or (c) as an earmarked contribution." (emphasis added).

12

II   MONTANA'S REGULATIONS GOVERNING "ELECTIONEERING
COMMUNICATIONS" ARE SUBSTANTIALLY OVERBROAD

Political speech deserves the highest protection because it is "indispensable

to decision making in a democracy, and this is no less true because the speech

comes from a corporation rather than an individual." *Citizens United v. FEC*, 558

U.S. 310, 349 (2000).  This heightened protection applies regardless of whether the

speaker is an individual or an entity:

> The Court has thus rejected the argument that political speech of
> corporations or other associations should be treated differently
> under the First Amendment simply because such associations are
> not "natural persons."

*Id. at* 343, quoting *First Natl' Bank of Boston v. Bellotti*, 435 U.S. 765, 776 (1978).

Overbroad statutes that restrict substantial amounts of protected speech are

subject to being invalidated under the First Amendment.  *Comite de Jornaleros de*

*Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 944 (9th Cir. 2011) (en

banc).  In such cases, the state "bears the burden of proving the constitutionality of

its actions."  *Id.*  Because a campaign-finance law "operate[s] in a core free-speech

zone and directly target[s] protected speech… we don't need to ask whether [it]

reaches a substantial amount of protected speech; by definition, it does."

*Wisconsin Right to Life, Inc. v. Barland,* 751 F.3d 804, 836 (7th Cir. 2014).

Disclosure regulations concerning campaign speech are subject to exacting

scrutiny – thereby requiring the state to show that they are substantially related to

an important government interest.  *Human Life of Washington, Inc. v. Brumsickle*, 624 F.3d 990, 1005 (9th Cir.2010).  In reviewing political speech regulations, the Supreme Court has long distinguished between those applicable to express advocacy (and its functional equivalent) and those applicable to issue advocacy. *Buckley,* 424 U.S. at 43-44; *WRTL*, 551 U.S. at 469-70.  Political speech constitutes express advocacy or its functional equivalent "only if the ad is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate."  *WRTL,* 551 U.S. at 470.  Political speech falling outside this category constitutes issue advocacy for which virtually any content-based regulation is unconstitutional.

The Supreme Court permits imposition of political committee burdens upon groups engaged in express advocacy or its functional equivalent, but has long rejected imposing them upon "groups engaged purely in issue discussion." *Buckley*, 424 U.S. at 79.  This is because "compelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment."  *Id.* at 64.  Political committees are "burdensome," "expensive to administer," and must comply with extensive regulations "just to speak."  *Id.*; see also *Citizens United*, 558 U.S. at 337 (describing federal political committee requirements as "burdensome" because committees "must appoint a treasurer, forward donations to the treasurer promptly, keep detailed records of the identities

14

of the persons making donations, preserve receipts for three years, and file an

organization statement and report changes to this information within 10 days");

*FEC v. Mass. Citizens for Life, Inc. (MCFL),* 479 U.S. 238, 252–56 (1986)

(declaring federal political committee requirements a "restriction on speech" that is

"substantial").

Montana's political committees must comply with numerous regulations that

inevitably chill many small groups that aren't willing to cut through Montana's red

tape in order to simply convey a political message.  *MCFL,* 479 U.S. at 255

("Faced with the need to assume a more sophisticated organizational form, to adopt

specific accounting procedures, to file periodic detailed reports . . . it would not be

surprising if at least some groups decided that the contemplated political activity

was simply not worth it"); *Minnesota Citizens Concerned for Life, Inc. v. Swanson,*

692 F.3d 864, 874 (8th Cir.2012) (Minnesota's law "manifestly discourages

associations, particularly small associations with limited resources, from engaging

in protected political speech").  This chill deprives citizens of speech needed to

evaluate issues of public importance.

The Seventh Circuit in *Barland* recently struck down a Wisconsin

campaign-finance statute that, like Montana's SB-289, imposed political

committee burdens upon issue advocacy groups.  *Barland,* 751 F.3d at 838.  The

court determined that, during the 60-day period before a general election (and the

15

30-day period before a primary election) in which the statute applied, essentially all political speech about issues triggered political committee regulations if a speaker said "pretty much anything at all" about a candidate for office. *Id.* at 836-37. Given the significant expense, burden, and chilling effect of political committee regulations on ordinary citizens, grassroots issue-advocacy groups, and § 501(c)(4) social-welfare organizations, Wisconsin's statute was substantially overbroad. *Id.* at 837-38.

The Ninth Circuit has also expressed concerns, albeit in dicta, about imposing political committee regulations upon groups engaged solely in issue advocacy. In *Brumsickle*, the court upheld a Washington state statute requiring groups expressly advocating passage of ballot initiatives to register as political committees. In so doing, however, it noted that "there is less danger of a regulation sweeping too broadly in the context of a ballot measure than in a candidate election." *Brumsickle*, 624 F.3d at 1018. With ballot initiatives, "the only issue advocacy that could potentially be regulated is advocacy regarding the single issue put before the public." *Id.* Notably, the Ninth Circuit observed the risk of Washington's statute regulating issue advocacy "*would engender far more concern if the relevant election involved a candidate.*" *Id.* (emphasis added).

The Ninth Circuit's concerns about regulating issue advocacy are particularly relevant to this case. Montana's "electioneering communication"

16

provisions, like the Wisconsin provisions struck down in *Barland*, regulate issue

advocacy – except Montana's are far broader.  The Seventh Circuit held

Wisconsin's electioneering provisions overbroad because they applied to any

speaker who said "pretty much anything at all" about a candidate for office.

*Barland,* 751 F.3d at 836-37.  Montana's electioneering communication provisions

don't just apply to "pretty much anything" said about a candidate – they literally

apply to anything said about a candidate within 105 days of an election.  § 13-1-

101(15)(i) & (ii), MCA; § 13-13-205(2), MCA; Rule 44.11.605(2)(a), ARM.

Moreover, they also apply to any communication referencing a political party.  §

13-1-101(15)(iii), MCA.  Thus, any group that makes any communication within

105 days of an election containing the name of a candidate or a political party is

now forced to comply with Montana's burdensome political committee

regulations.

While Wisconsin's electioneering statute attempted to regulate only speech

that discussed a candidate's qualifications, Montana's regulations reach any

communication made within 105 days of an election if that communication simply

contains the name of a candidate or a party.  Thus, if Wisconsin's more narrowly-

tailored statute is unconstitutionally overbroad, it follows, *a fortiori* , that

Montana's broader statute is, too.

III   MONTANA'S COMPELLED-VOTE-REPORTING PROVISION
      IS UNCONSTITUTIONAL

Along with challenging Montana's regulations regarding "electioneering"

communications, NAGR also challenges Montana's Compelled-Vote-Reporting

Provision.  § 13-35-225(3), MCA.  This Court has struck down that provision

twice since 2012.  Apparently thinking the third time will be the charm, the

Montana Legislature revised the Compelled-Vote-Reporting Provision again in

2015.  Even in its newest form, however, the provision is still subject to strict

scrutiny for two reasons.  First, the provision compels speech by political speakers.

Second, it is content-based.  These infirmities are discussed in detail below.

A. The Compelled-Vote-Reporting Provision is Subject to Strict Scrutiny
   Because It Compels Speech

The First Amendment applies to speech NAGR *does not* desire to make

because "freedom of speech prohibits the government from telling people what

they must say" as well as what they cannot say.  *Agency for International*

*Development v. Alliance for Open Society International, Inc*., 133 S.Ct. 2321, 2328

(2013), quoting *Rumsfeld v. Forum for Academic and Institutional Rights, Inc*.,

547 U.S. 47, 61 (2006).  In fact, state compulsion of speech is even more

constitutionally suspect than state compulsion of silence.  *West Virginia Board of*

*Education v. Barnette*, 319 U.S. 624, 633 (1943) ("[I]nvoluntary affirmation could

be commanded only on even more immediate and urgent grounds than silence");

*Wooley v. Maynard*, 430 U.S. 705, 715 (1977) (finding that "[c]ompelling [an] affirmative act … involved a more serious infringement upon personal liberties than" compelling a "passive act").

Compelled speech laws often reduce speech when, as in this case, the government compels inclusion of its message with the speaker's own message. The Supreme Court noted this problem when it analyzed a "right of reply" statute requiring a newspaper to print a candidate's response, free of charge, whenever the newspaper criticized the candidate. *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 244 (1974). The Court held that "political and electoral coverage would be blunted or reduced" by the statute because "editors might well conclude that the safe course is to avoid controversy." *Id.*, 418 U.S. at 257. Thus, such "government-enforced right of access inescapably dampens the vigor and limits the variety of public debate." *Id.*, 418 U.S. at 257, quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 279 (1964).

For these reasons, laws compelling speech are subject to strict scrutiny. *Knox v. SEIU, Local 1000*, 132 S.Ct. 2277, 2288 (2012) ("government may not … compel the endorsement of ideas that it approves" and if it does, such regulations "are subject to exacting First Amendment scrutiny"). Compelled speech in the political arena falls squarely within this rule. See, *e.g.*, *Toledo Area AFL-CIO Council v. Pizza*, 154 F.3d 307, 313-14 (6th Cir. 1998) (statute unlawfully

19

compelled speech by requiring corporations and unions, before seeking political contributions from employees, to advise that such contributions would not affect employment status).

By requiring inclusion of statements about the prior votes of incumbents, Montana's Compelled-Vote-Reporting Provision does just what the Supreme Court said is impermissible—it empowers the government to "tell[ ] people what they must say." *Agency for International Development,* 133 S.Ct. at 2328.  It is therefore subject to strict scrutiny.

B.  The Compelled-Vote-Reporting Provision is Also Subject to Strict Scrutiny Because It is a Content-Based Restriction on Speech

State regulation of speech is "content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 135 S.Ct. 2218, 2227 (2015).  Laws burdening speech based upon content are subject to strict scrutiny.  *Id.*; *Arizona Right to Life PAC v. Bayless,* 320 F.3d 1002, 1009 (9th Cir. 2003).  Applying strict scrutiny to content-based laws "distinguish[es] those regulations that seek to advance legitimate regulatory goals from those that seek to suppress unpopular ideas or information or to manipulate the public debate through coercion rather than persuasion." *Jacobs v. Clark County School Dist.*, 526 F.3d 419, 433 (9th Cir. 2008), quoting *Turner Broadcasting System, Inc. v. FCC,* 512 U.S. 622, 641 (1994).

Montana's Compelled-Vote-Reporting Provision is content-based because it distinguishes political speech based upon whether or not it contains references to candidate voting records.  § 13-35-225(3), MCA.  Persons whose speech does not contain such references are not subject to the provision.  *Id.*  Persons who do make reference to a candidate's voting record, by contrast, must comply with it.  *Id.* Montana's Compelled-Vote-Reporting Provision is therefore subject to strict scrutiny.

C. <u>Montana's Compelled-Vote-Reporting Provision Cannot Survive Strict Scrutiny Because Insulating Legislators From Criticism is Not a Compelling Interest</u>

Statutes such as Montana's Compelled-Vote-Reporting Provision that "burden political speech are subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Citizens United*, 558 U.S. at 898. Sparing politicians from hurt feelings is not a compelling state interest because "the First Amendment requires that politicians tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment." *Bayless*, 320 F.3d at 1014, quoting *Boos v. Barry*, 485 U.S. 312, 322 (1988).

The state's interest in providing information to voters may well be an important one. *Canyon Ferry Road Baptist Church v. Unsworth,* 556 F.3d 1021,

21

1032 (9th Cir. 2009) ("[W]e have little trouble concluding that Montana's informational interest is generally important in the context of Montana's statewide ballot issues.").  Providing information to voters concerning incumbent voting records, however, is not a compelling interest.

Moreover, Montana's Compelled-Vote-Reporting Provision is not narrowly tailored because other means exist for voters to examine the veracity of claims made about a candidate's voting record.  *United States v. Playboy Entertainment Group, Inc.,* 529 U.S. 803, 816 (2000) ("When a plausible, less restrictive alternative is offered to a content-based speech restriction, it is the Government's obligation to prove that the alternative will be ineffective to achieve its goals"). Specifically, the Supreme Court has held that the government's ability to create a database providing the same information as a compelled-speech statute renders the statute unnecessary and therefore unconstitutional.  See, *e.g., United States v. Alvarez,* 132 S.Ct. 2537, 2551 (2013) (state's interest in honoring military bravery by criminalizing false claims of receiving a Medal of Honor could be achieved by an online database of Medal of Honor winners that could expose false claims); *Riley v. National Federation of the Blind*, 487 U.S. 781, 800 (1988) (state's interest in requiring fundraisers to disclose to all potential donors the percentage of gross receipts turned over to fundraiser's charity could be met by state publishing detailed financial disclosure forms required of fundraisers).

In this case, Montana already has an online database enabling voters to easily examine the legislative voting records of candidates.[7]  Forcing private groups to publish this information on *their* campaign materials is entirely unnecessary.  The Compelled-Vote-Reporting Provision is not narrowly tailored, thereby requiring its invalidation by this Court.

IV     NAGR IS ENTITLED TO A PRELIMINARY INJUNCTION

To obtain injunctive relief, a plaintiff must show (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm if injunctive relief is not granted, (3) the balance of equities tips in his or her favor, and (4) an injunction is in the public interest.  *Winter v. Natural Res. Def. Council, Inc.*, 129 S.Ct. 365, 374 (2008).  As shown below, NAGR can satisfy each of these requirements.

A   NAGR is Likely to Succeed on the Merits

NAGR has previously demonstrated that the challenged provisions of SB-289 unquestionably violate the First Amendment, as does the Commissioner's impending efforts to penalize NAGR for distributing the Tutvedt Mailer in 2012.[8]  It is therefore likely to succeed on the merits.

---

[7] See http://leg.mt.gov/css/default.asp

[8] See Parts I through III, *supra*.

At the very least, NAGR has satisfied the alternate "sliding scale" approach applied by the Ninth Circuit to preliminary injunction motions. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011). Under this rule, NAGR is entitled to injunctive relief because it has raised "serious questions going to the merits" along with showing (as described below) that the balance of the hardships tips sharply in NAGR's favor and that the other two *Winter* factors favor NAGR. *Id.* at 1135.

B.  NAGR Will Suffer Irreparable Harm if Relief is not Granted

Ongoing or future constitutional violations by a defendant satisfy the irreparable harm requirement because "unlike monetary injuries, constitutional violations cannot be adequately remedied through damages." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009); *Monterey Mechanical Co v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997) ("an alleged constitutional infringement will often alone constitute irreparable harm"). Moreover, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976). Such "harm is particularly irreparable where, as here, a plaintiff seeks to engage in political speech, as timing is of the essence in politics and [a] delay of even a day

or two may be intolerable." *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1128 (9th Cir. 2011).

As stated previously, Montana's impending enforcement of SB-289, as well as its impending efforts to penalize NAGR for sending the Tutvedt Mailer, violate NAGR's rights under the First Amendment.[9]  This deprivation will continue until this Court grants relief, relief that cannot be achieved with monetary damages. This factor thus weighs in favor of granting injunctive relief.

## C  The Balance of Equities Tips Sharply in NAGR's Favor

In the Ninth Circuit, "the fact that a case raises serious First Amendment questions compels a finding that . . . the balance of hardships tips sharply in [the plaintiffs'] favor." *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 973 (9th Cir. 2002).  If NAGR is denied injunctive relief, its First Amendment rights will be violated. On the other hand, there is no detriment to the State from enjoining an unconstitutional law.  *Sanders County Republican Cent. Comm. v. Bullock*, 698 F.3d 741, 749 (9th Cir. 2012).  This factor sharply tips in NAGR's favor.

---

[9] See Parts I through III, *supra*.

D. Enjoining the Statute is in the Public Interest

NAGR's First Amendment rights are ones that, if protected, will unquestionably advance the public interest. *Thalheimer*, 645 F.3d at 1129 ("Courts considering requests for preliminary injunctions have consistently recognized the significant public interest in upholding First Amendment principles."); *Joelner v. Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004) ("it is always in the public interest to protect First Amendment liberties"). This factor therefore favors granting injunctive relief as well.

## CONCLUSION

All four factors of the *Winter* test for injunctive relief strongly favor NAGR. Because NAGR will suffer irreparable harm if it cannot engage in its intended political speech before ***May 15, 2016,*** it requests that this Court grant this motion for a preliminary injunction.

DATED: March 29, 2016

<div style="margin-left:40%">

Respectfully submitted,

/s/ Matthew G. Monforton
Matthew G. Monforton

Attorney for Plaintiff
National Association For Gun Rights

</div>

## <u>CERTIFICATE OF COMPLIANCE PURSUANT TO L. R. 7.1(d)(2)(E)</u>

I hereby certify that this document, excluding caption and certificate of compliance, contains 5734 words, as determined by the word count of the word processing software used to prepare this document, specifically Microsoft Word 2007.


DATED: March 29, 2016     <u>/s/ Matthew G. Monforton</u>
                                       Matthew G. Monforton

                                       Attorney for Plaintiff
                                       National Association For Gun Rights