IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
HELENA DIVISION

**FILED**

**MAY 23 2016**

Clerk, U.S. Courts
District Of Montana
Missoula Division

| | |
|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, INC., <br><br>             Plaintiff, <br><br> vs. <br><br> JONATHAN MOTL, in his official capacity as the Commissioner of Political Practices for the State of Montana; TIMOTHY C. FOX, in his official capacity as Attorney General for the State of Montana; LEO GALLAGHER, in his official capacity as County Attorney for the County of Lewis & Clark, <br><br>             Defendants. | CV 16–23–H–DLC <br><br> (Consolidated with CV 16–33–H–DLC) <br><br> ORDER |

## I. Introduction

Consolidated Plaintiffs National Association for Gun Rights, Inc.,

("NAGR") and J.C. Kantorowicz (collectively "Plaintiffs") move the Court for a

preliminary injunction enjoining Defendants Jonathan Motl, Timothy C. Fox, and

Leo Gallagher[1] (collectively "Defendants") from enforcing Montana Code

---

[1] Defendants Motl, Fox, and Gallagher are being sued in their official capacity as Commissioner of Political Practices ("COPP"), Attorney General, and County Attorney for Lewis and Clark County, respectively.

-1-

Annotated ("MCA") § 13-35-225(3), Montana's vote disclosure statute.  NAGR

also separately moves the Court to: (1) enjoin Defendants from enforcing MCA

§ 13-1-101(15), which defines an electioneering communication under Montana

law; and (2) grant injunctive and declaratory relief concerning an alleged political

mailer NAGR sent in 2012.  For the reasons explained below, the Court grants

Plaintiffs' motion in part and denies in part.  The Court will preliminarily enjoin

enforcement of § 13-35-225(3), but will deny the motion pertaining to

§ 13-1-101(15) and the 2012 mailer.

## II. Background

### A.  National Association for Gun Rights, Inc.

As discussed in previous orders by this Court, Plaintiff NAGR is a tax-

exempt organization under Internal Revenue Code § 501(c)(4).  *See NAGR v.*

*Murray*, 969 F. Supp. 2d 1262, 1264–1265 (D. Mont. Sept. 17, 2013) ("*NAGR I*").

NAGR's stated "mission is to defend the right to bear arms, and advance that God-

given Constitutional Right" by educating the public and "urging them to take

action in the public policy process."  (Doc. 1 at 6.)  In 2012, NAGR sent a mailer[2]

("2012 Mailer") to the residents of Montana Senate District 3 ("SD 3") in Flathead

---

[2] Also referred to as "slicks," mailers are glossy, oversized postcard-type documents sent
by mail to the general public.  (Doc. 1 at 22.)

County, Montana.  The 2012 Mailer discussed state Senator Bruce Tutvedt's alleged attempts to "kill" Senate Bill 371.  (Doc. 1 at 20.)

Senate Bill 371, entitled "[a]n act ensuring the availability of Montana ammunition; encouraging the formation of business in Montana primarily engaged in the manufacture of ammunition components," died in the legislative process during the 2011 Montana Session.  The 2012 Mailer alleged that "**FACT**: Flathead County was poised to get a new smokeless powder plant until Bruce Tutvedt took to the Senate Floor and demanded it be killed.  (S.B. 371, 4/13/11 Audio)  Now, thanks to Bruce Tutvedt, unemployment in the Flathead is nearly 11% percent." (Doc. 1 at 20. (emphasis in original))  The mailer further urged the recipient to "[c]ontact Bruce Tutvedt right away and **DEMAND** he apologize for killing new manufacturing in Flathead County."  (*Id.* (emphasis in original))

In January of 2016, Defendant Commissioner of Political Practices Jonathan Motl ("Motl") issued a document entitled "Summary of Facts and Findings of Sufficient Evidence to Show a Violation of Montana's Campaign Practices Act." ("2016 COPP Findings") (Doc. 1 at 22.)  In these findings, the COPP states that NAGR, along with six other corporate entities, "failed to meet Montana campaign practice law and standards by failing to register, report and disclose . . . illegal corporate contributions for or against a SD 3 Republican primary election

-3-

candidate." (*Id.* at 33.) The 2016 COPP Findings further allege that NAGR coordinated with Rollan Roberts II, a 2012 candidate for SD 3, through "attack slicks [and] attack letters" which constitute "express advocacy and coordinated in-kind expenditures." (Doc. 1 at 35.) The 2016 COPP Findings concluded with the finding that there is sufficient evidence justifying civil prosecution under Montana law and submitted the matter to the Lewis and Clark County Attorney.

### B. J.C. Kantorowicz[3]

Plaintiff J.C. Kantorowicz ("Kantorowicz") is a 2016 Republican primary election candidate for Montana Senate District 10 ("SD 10"). In January of 2016, Kantorowicz sent a letter to 1100 residents of SD 10 criticizing state representative Steve Fitzpatrick's ("Fitzpatrick") voting record. Fitzpatrick is a Republican seeking election to SD 10. The January 2016 letter refers to Fitzpatrick as a "RINO"[4] and characterizes his voting record in the Montana House of Representatives as "consistently vot[ing] with the Democrats." (Doc. 1-2 at 1.) The letter further alleges that "[w]henever votes were close on a Republican bill before the Legislature, [Fitzpatrick] cast the deciding vote to

---

[3] Citations to the docket in this sub-section refer to the docket in *Kantorowicz v. Motl, et al.*, CV 16-33-H-DLC-JTJ.

[4] "RINO" is commonly known as an acronym for "Republican in Name Only."

-4-

defeat the bill.  The only time he voted with Republicans was when the Democrats also voted with the GOP to overwhelmingly pass legislation."  (*Id.*)

In response to the letter, Fitzpatrick filed a complaint with the COPP stating that Kantorowicz violated MCA § 13-35-225(3) by not "providing a reference to the particular vote or votes upon which the information is based" and by not providing a signed statement affirming that the statements about his voting record are accurate and true. (Doc. 1-3 at 3.)  The COPP then sent Kantorowicz a letter informing him of the complaint and requested an expedited response due to the upcoming election.  The COPP's letter further states that an investigation may be conducted and "[u]pon the completion of [this] investigation a summary of facts and statement of findings will be prepared and a copy will be sent to you.  This letter does not foreclose any other options available to the Commissioner to address the issues raised by the Complaint."  (Doc. 1-5 at 2.)

### C. Present Litigation

In March of 2016, NAGR filed suit in this Court bringing three claims for relief.  NAGR's first claim for relief requests a declaratory ruling that the 2012 Mailer was issue advocacy and not subject to regulation under Montana law, and therefore, the Court should enjoin the COPP from pursuing civil penalties based on the 2012 Mailer.  Second, NAGR argues that MCA § 13-1-101(15), which

defines "electioneering communication," is unconstitutionally overbroad under the

First Amendment to the United States Constitution and should be struck down.

This statute provides,

> (a) "electioneering communication" means a paid communication that
> is publicly distributed by radio, television, cable, satellite, internet
> website, newspaper, periodical, billboard, mail, or any other
> distribution of printed materials, that is made within 60 days of the
> initiation of voting in an election, that does not support or oppose a
> candidate or ballot issue, that can be received by more than 100
> recipients in the district voting on the candidate or ballot issue, and
> that:
>> (i) refers to one or more clearly identified candidates in that
>> election;
>> (ii) depicts the name, image, likeness, or voice of one or more
>> clearly identified candidates in that election; or
>> (iii) refers to a political party, ballot issue, or other question
>> submitted to the voters in that election.
>
> (b) The term does not mean:
>> (i) a bona fide news story, commentary, blog, or editorial
>> distributed through the facilities of any broadcasting station,
>> newspaper, magazine, internet website, or other periodical
>> publication of general circulation unless the facilities are
>> owned or controlled by a candidate or political committee;
>> (ii) a communication by any membership organization or
>> corporation to its members, stockholders, or employees;
>> (iii) a commercial communication that depicts a candidate's
>> name, image, likeness, or voice only in the candidate's capacity
>> as owner, operator, or employee of a business that existed prior
>> to the candidacy;
>> (iv) a communication that constitutes a candidate debate or
>> forum or that solely promotes a candidate debate or forum and
>> is made by or on behalf of the person sponsoring the debate or
>> forum; or
>> (v) a communication that the commissioner determines by rule

is not an electioneering communication.

Mont. Code. Ann. § 13-1-101(15)(a). NAGR seeks a preliminary injunction enjoining Defendants from enforcing § 13-1-101(15)(a).

Finally, in its third claim for relief, NAGR contends that § 13-35-225(3) impermissibly compels speech in violation of the First Amendment and that the Defendants must be enjoined from enforcing it. This statute states,

> Printed election material described in subsection (1) that includes information about another candidate's voting record must include the following:
>> (i) a reference to the particular vote or votes upon which the information is based;
>> (ii) a disclosure of all votes made by the candidate on the same legislative bill or enactment; and
>> (iii) a statement, signed as provided in subsection (3)(b), that to the best of the signer's knowledge, the statements made about the other candidate's voting record are accurate and true.

Mont. Code. Ann. § 13-35-225(3)(a). Plaintiff Kantorowicz's complaint also challenges the constitutionality of § 13-35-225(3) and advances essentially the same arguments as NAGR. In order to encourage judicial efficiency, the Court has consolidated the claims of NAGR and Kantorowicz concerning § 13-35-225(3).

## II. Applicable Law

"A preliminary injunction is not a preliminary adjudication on the merits,

but a device for preserving the status quo and preventing the irreparable loss of rights before judgment." *Textile Unlimited, Inc. v. A.BMH and Co., Inc.*, 240 F.3d 781, 786 (9th Cir. 2001). Further, injunctive relief is an extraordinary remedy only granted upon a clear showing that a plaintiff is entitled to such relief. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008). Accordingly, Plaintiffs must meet four elements to obtain a preliminary injunction: (1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction advances the public interest. *Id.* at 20.

## III. Analysis

### A. 2012 Mailer

As stated above, NAGR seeks declaratory and injunctive relief concerning the 2012 Mailer. NAGR contends that the COPP will soon initiate civil proceeding against it for failing to register as a political committee in 2012 and urges the Court to enjoin Defendants from taking action. In support of this argument, NAGR contends that the 2012 Mailer was not an "expenditure"[5] under

---

[5] In 2012, Montana law defined an "expenditure" as a "a purchase, payment, distribution, loan, advance, promise, pledge, or gift of money or anything of value made for the purpose of influencing the results of an election." Mont. Code. Ann. § 13-1-101(11)(a) (2013). This definition has since been amended by the legislature. *See* Mont. Code. Ann. § 13-1-101(17)(a) (2015) (defining "expenditure" as "a purchase, payment, distribution, loan, advance, promise, pledge, or gift of money or anything of value: (i) made by a candidate or political committee to

Montana law at the time it was sent because it could not have been reasonably interpreted "as an appeal to vote for or against a specific candidate." (Doc. 4 at 17. (quoting *Fed. Election Commn. v. Wisconsin Right To Life, Inc.*, 551 U.S. 449, 469–470 (2007)) As such, NAGR argues, this Court should issue a declaratory ruling that NAGR did not have to comply with Montana's political committee requirements in 2012 because the 2012 Mailer was not expressly advocating the defeat or election of a candidate and was not, therefore, express advocacy.

Before the Court can address NAGR's request for declaratory and injunctive relief on the merits, it must initially determine whether NAGR has standing to bring its first claim. Article III of the United States Constitution mandates that courts must only "adjudicate live cases or controversies" and should refrain from issuing advisory opinions. *Thomas v. Anchorage Equal Rights Commn.*, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc) (citing to U.S. Const. art. III); *see also Id.* at 1139 (stating that a court's jurisdiction should only be exercised if the issue presented is "definite and concrete, not hypothetical or abstract.") (quoting *Railway Mail Ass'n v. Corsi*, 326 U.S. 88, 93 (1945)). The concept of standing is often hard to separate from the concept of ripeness. *Id.* at 1138–1139 (stating that

---

support or oppose a candidate or a ballot issue; or (ii) used or intended for use in making independent expenditures or in producing electioneering communications").

"[t]he overlap between these concepts has led some legal commentators to suggest that the doctrines are often indistinguishable") (citations omitted).  Nonetheless, a "ripeness inquiry contains both a constitutional and a prudential component." *Portman v. County of Santa Clara*, 995 F.2d 898, 902 (9th Cir. 1993); *see also Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57 n. 18 (1993) (providing that the ripeness doctrine "is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction").

In order to satisfy the constitutional component of ripeness, NAGR must show that the constitutional "case or controversy" requirement has been satisfied by an "injury in fact." *Thomas*, 220 F.3d at 1138 (citations omitted).  An injury in fact can be shown by a "genuine threat of imminent prosecution." *Id.* at 1139 (citation omitted).  "In evaluating the genuineness of a claimed threat of prosecution, [courts] look to whether . . . the prosecuting authorities have communicated a specific warning or threat to initiate proceedings." *Id.*

Here, NAGR contends that the constitutional component of ripeness is satisfied because the 2016 COPP Findings constitute a genuine threat of imminent prosecution.  The Court would be inclined to agree with NAGR about the COPP's intentions concerning prosecution if the 2016 COPP Findings were the only evidence at bar.  However, Defendant Motl filed a signed declaration with this

-10-

Court stating that "the Lewis and Clark County Attorney . . . has waived its first right of enforcement" against NAGR.  (Doc. 14-1 at 1.)  Further, Motl states that though the COPP may initiate civil proceeding against NAGR through the filing of a civil enforcement complaint in state district court, "[i]t is possible and, even likely, that the [COPP] will forgo litigation with NAGR."  (*Id.* at 2.)  As such, though the 2016 COPP Findings may constitute a threat, the Court finds that this threat is neither genuine nor imminent.[6]

Additionally, the parties concede that the statute of limitations for prosecuting any claim regarding the 2012 Mailer runs, at the latest, on June 5, 2016.  This date is less than two weeks away.  Considering that the question of whether the COPP will prosecute NAGR will be determined with absolute finality in a little under two weeks, possibly rendering this matter moot, the Court finds it appropriate to refrain from issuing an advisory opinion in this matter. Accordingly, the Court will deny NAGR's first request for declaratory and injunctive relief without prejudice.

## B.  Electioneering Communication Statute

As stated above, in its second claim for relief, NAGR asserts that Montana's

---

[6] Because the Court finds that NAGR fails to satisfy the constitutional component of ripeness, the Court declines to address NAGR's arguments concerning the prudential component of standing.

definition of "electioneering communication" is unconstitutionally overbroad because it impermissibly imposes reporting requirements upon groups engaged in pure issue advocacy.  Again, the Court must first determine if NAGR has standing to bring this claim before turning to the merits.

### 1. Standing

Unlike NAGR's first claim, which dealt with a situation where NAGR had already spoken, NAGR's second claim arises out of its stated intention to speak in the near future, mainly through "issue advocacy mailings" similar to the 2012 Mailer.  (Doc. 1 at 8.)  NAGR, however, states that it will not send these mailers if doing so would require the organization to register as a political committee.

As discussed above, NAGR can satisfy Article III's case or controversy requirement through the showing of an injury in fact. *Thomas*, 220 F.3d at 1138 (citations omitted).  In pre-enforcement cases, an injury in fact can be established by "demonstrating a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).  To demonstrate this danger, plaintiffs must allege: (1) an intention to engage in conduct arguably influenced by a constitutional interest, but prohibited by statute; and (2) a credible threat of prosecution. *Id.*  Typically, plaintiffs can

establish a credible threat by: (1) showing "a reasonable likelihood that the government will enforce the challenged law against them"; (2) "establish[ing], with some degree of concrete detail, that they intend to violate the challenged law"; and (3) showing that the law is applicable to plaintiffs. *Id.* at 786.

Although this is a close call, the Court concludes that NAGR has standing to challenge Montana's definition of an electioneering communication as defined in MCA § 13-1-101(15), primarily because NAGR has alleged an intention to engage in advocacy arguably impacted by the First Amendment, i.e., sending mailers to the general public "in May of 2016 describing which public officials have supported the rights of citizens to keep and bear arms and engage in lawful self-defense, as well as those who have not done so." (Doc. 1 at 8.)

Although NAGR fails to provide the Court with copies of the mailers it wants to send, it insists that it intends on sending materials similar to the 2012 Mailer. (Doc. 4 at 16. (describing the 2012 Mailer as "a postcard typical of the kind of literature NAGR intends to mail")) However, the question remains whether NAGR has shown "in concrete detail" that its future mailers would arguably qualify as an "electioneering communication" under § 13-1-101(15).

The Ninth Circuit has found plaintiffs seeking pre-enforcement injunctive relief must "articulate a concrete plan to violate the law in question by giving

details about their future speech such as when, to whom, where, or under what circumstances." *Lopez*, 630 F.3d at 787 (citation and punctuation marks omitted). Plaintiffs must provide "allegations . . . specific enough so that a court need not speculate as to the kinds of political activity the [plaintiffs] desire to engage in or as to the contents of their proposed public statements or the circumstances of their publication." *Id.* (citation and quotation marks omitted).

Turning to NAGR's intentions to send its mailers, the Court finds that it has provided enough detail about its intended mailers to qualify as a concrete plan to violate § 13-1-101(15). NAGR provides the "when" (May 2016), the "whom" (Montana's public office holders), the "where" (Montana), and under what circumstances (mailers providing information describing "which public officials have supported the rights of citizens to keep and bear arms and engage in lawful self-defense"). (Doc. 1 at 8.) As long as the officeholders mentioned in NAGR's mailers are candidates in an upcoming election, and are received by more than 100 people, NAGR's mailers would arguably qualify as an electioneering communication under Montana law.

Ideally, NAGR should have provided the Court with copies of the actual, proposed mailer, or more precise details about its mailers, such as: (1) the names of the officeholders; (2) the precise legislative issue to be discussed; or (3) the

exact destination of the mailers.  However, because "First Amendment cases raise

unique standing considerations, that tilt dramatically toward a finding of

standing," the Court gives NAGR the benefit of the doubt concerning its mailers.

*Lopez*, 630 F.3d at 781 (citation and punctuation marks omitted).  Accordingly, the

Court is satisfied that NAGR has provided enough detail concerning its intentions

to engage in speech that arguably triggers § 13-1-101(15) and its corresponding

disclosure requirements.  *Id.* at 786.

Lastly, as discussed during the preliminary injunction hearing, NAGR's

proposed mailers would probably, at the least, qualify as an electioneering

communication and require some disclosure, possibly as an incidental committee.

*See* Mont. Code. Ann. § 13-1-101(30)(b) (stating that political committee include

incidental committees).  NAGR, however, has been clear that it will not send its

mailers if it has to register as political committee.  (Doc. 1 at 8.)  Due to the fact

that similarly situated plaintiffs have been prosecuted for violating Montana's

disclosure requirements,[7] the threat of prosecution against NAGR for failing

comply with Montana's voter disclosure laws is credible.  *Lopez*, 630 F.3d at

_____

[7] In support of this finding, the Court takes notice of the COPP's website which lists dozens of complaints related to Montana's campaign finance laws that have resulted in settlement or litigation. *See* Commissioner of Political Practices, *Recent Decisions*, http://politicalpractices.mt.gov/2recentdecisions/campaignfinance.mcpx (accessed May 19, 2016).

786–787 (providing that "[a] history of past enforcement against parties similarly situated to the plaintiffs cuts in favor of a conclusion that a threat is specific and credible"). Accordingly, the Court is satisfied that NAGR's second claim presents a constitutional injury in fact.

### 2. Preliminary Injunction Analysis

As stated in section III, in order for the Court to enjoin MCA § 13-1-101(15), NAGR must show that it is likely to succeed on the merits. *Winter*, 555 U.S. at 22. In support of an injunction, NAGR contends that Montana's regulations concerning electioneering communications are unconstitutionally overbroad. Specifically, NAGR asserts that § 13-1-101(15) impermissibly over regulates issue advocacy and cites to *Wisconsin Right To Life, Inc. v. Barland*, 751 F.3d 804 (7th Cir. 2014).[8] As a preliminary matter, the Court disagrees with NAGR's argument that regulation of issue advocacy is per se unconstitutional.

---

[8] In its briefing, NAGR fails to allege a traditional constitutional overbreadth argument. *E.g. United States v. Williams*, 553 U.S. 285, 292–293 (2008) (stating that the Supreme Court has "vigorously enforced the requirement that a statute's overbreadth be substantial, not only in an absolute sense, but also relative to the statute's plainly legitimate sweep") (citations omitted); *see also Id.* ("Invalidation for overbreadth is strong medicine that is not to be casually employed.") (citation and quotation marks omitted). Nonetheless, the Court is not persuaded that § 13-1-101(15) is overbroad.

First, even if materials like the 2012 Mailer would be considered issue advocacy, of which the Court is skeptical, the Ninth Circuit, guided by the United States Supreme Court's decision in *Citizens United v. FEC*, has refused to recognize "a bright-line rule distinguishing express and issue advocacy," and "reject[s] [the] contention that . . . disclosure requirements must be limited to speech that is the functional equivalent of express advocacy." *Human Life of Washington Inc. v. Brumsickle*, 624 F.3d 990, 1016 (9th Cir. 2010) (quoting 558 U.S. 310, 369 (2010)).  Accordingly, as long as the disclosure requirements satisfy constitutional scrutiny, they are permissible under the First Amendment.

Next, even if the Court was to accept NAGR's argument that its mailers would be considered issue advocacy, the Ninth Circuit has stated that imposing campaign finance disclosures obligations on communications engaged in issue advocacy is constitutional as long as the regulation is "substantially related to a sufficiently important governmental interest," i.e., the regulation meets exacting scrutiny. *Brumsickle*, 624 F.3d at 1016.

Turning to MCA § 13-1-101(15), the Court finds that this regulation functions as a disclosure requirement.  As explained in Defendants' brief in response to NAGR's motion for preliminary injunction, § 13-1-101(15) mandates minimal reporting requirements for groups that produce materials considered to be

-17-

electioneering communications.  If a group distributes an "electioneering communication" as defined by § 13-1-101(15), they have made an "expenditure under" MCA 13-1-101(17)(a), and must register as a "political committee."  Mont. Code. Ann. § 13-1-101(30)(a)(iii).  The degree of political activity by the group correlates to committee designation, which in turn, determines their disclosure requirements.  (*See* Doc. 14-2 ("Declaration of Jonathan Motl").)  A group's appropriate committee classification is determined when a "Statement of Organization" ("Form C-2") is filed.  (Doc. 14-2 at 4–5.)  This form is "usually completed in 10 minutes or less."  (*Id.* at 4.)  Further, it requires the disclosure of the group's "treasurer/contact . . ., a brief description of the committee type and purpose, a list of the names of candidates identified by expenditure and the name and address of the bank used by the political committee."  (*Id.* at 3.)

In addition to Form C-2, groups must also report and disclose their "reportable election activity."  (*Id.* at 4.)  This is accomplished through the filing of a Form C-4, required for Incidental Committees, or a Form C-6, required for Independent Committees.  Both of these forms, however, require disclosure of "receipts and expenditures, including some basic information -- name, address and date; occupation and employer for contributions; and the purpose, by brief

-18-

description, of the expenditures." (*Id.* at 7.) These forms are readily accessible through the COPP's website.

Because these regulations and required forms function as disclosures, the Court must examine them through exacting scrutiny. Defendants contend that these regulations serve an important government interest by: (1) promoting transparency; (2) informing the public about the entity competing for their attention; and (3) avoiding circumvention. *Citizens United*, 558 U.S. at 369; *Brumsickle*, 624 F.3d at 1008, 1011–1012; *Alaska Right to Life v. Miles*, 441 F.3d 773, 793 (9th Cir. 2006). The Court agrees and further finds that the regulation in question is sufficiently related to these governmental interests. In support of this finding, the Court notes that Montana's disclosure requirements are narrowly tailored because "the required disclosure increases as a political committee more actively engages in campaign spending and as an election nears." *Brumsickle*, 624 F.3d 990 at 1013. This preliminary finding is further confirmed by Motl's declaration. (Doc. 14-2.)

Further, if NAGR truly intends on pursuing advocacy that is purely issue based, then it would likely only be required to register as an incidental committee. As previously discussed by this Court in *NAGR I*, "the public's interest in transparent political funding outweighs the minimal burden the incidental

-19-

disclosure requirements impose, even for one-time expenditures." *NAGR I*, 969 F.

Supp. 2d at 1270 (citing *Family PAC v. McKenna*, 685 F.3d 800, 809 (9th Cir.

2012)).  Accordingly, the Court finds that NAGR's challenge to MCA

§ 13-1-101(15) is not likely to succeed on the merits.[9]  Because NAGR is not

likely to succeed on the merits, the Court need not consider the remaining

preliminary injunction factors under *Winter*.  *Thalheimer v. City of San Diego*, 645

F.3d 1109, 1115 (9th Cir. 2011) (district court "properly considered the remaining

*Winter* elements only as to claims it concluded were meritorious").  As such, the

Court will deny NAGR's request to enjoin MCA § 13-1-101(15).

## C. Montana's Vote Disclosure Law

Finally, the Court turns to Plaintiffs' arguments concerning Montana's vote

disclosure requirements, i.e., MCA § 13-35-225(3).  However, before turning to

the merits, the Court must first establish that Plaintiffs have standing to seek a

preliminary injunction.

---

[9] The Court also notes that it is not persuaded by NAGR's citation to *Wisconsin Right To Life, Inc. v. Barland*, 751 F.3d 804 (7th Cir. 2014).  Disregarding the fact that this authority is not controlling, the Court also finds the case distinguishable to the one at bar.  *Barland* found that Wisconsin's disclosure requirements were constitutionally flawed because they "indiscriminately" imposed "full-blown PAC duties" and required complicated and detailed reporting requirements.  *Barland*, 751 F.3d at 839–841.  That is simply not the case with Montana's disclosure requirements which tailor the amount of reporting to the degree of political activity.  (*See* Doc. 14-2.)

### 1. Standing

As discussed in a previous section, the Court narrowly concluded that NAGR has standing to challenge the electioneering communication statute. For the reasons previously explained, the Court also finds that NAGR has standing to challenge the vote disclosure requirement. (*See also* Doc. 1 at 9. ( "NAGR does not desire to distribute such literature if NAGR will be required, under . . . § 13-35-225(3)(a), to include the compelled speech required by the statute.")) Additionally, the Court concludes that Kantorowicz has unquestionable standing to challenge § 13-35-225(3). Unlike NAGR's claim, which seeks pre-enforcement relief, the threat of an injury in fact to Kantorowicz is much more likely because he is already being investigated by the COPP for violating § 13-35-225(3).[10]

### 2. Preliminary Injunction Factors

#### i. Likelihood of Success on the Merits

As a preliminary matter, this Court must establish the proper standard of constitutional scrutiny to apply to Montana's vote disclosure requirement. Defendants contend that the Court should review this requirement under exacting scrutiny because it is a permissible election "disclosure" as discussed in

---

[10] The Court notes that Kantorowicz's situation, in terms of standing, is different than the standing issues raised in NAGR's first claim concerning the 2012 Mailer. Unlike NAGR's situation, the COPP has not stated that future prosecution against Kantorowicz is unlikely.

*Brumsickle*. *See* 624 F.3d at 1005 (applying exacting scrutiny to Washington's

disclosure law). Required vote disclosures in election materials, Defendants

argue, are constitutionally sound because these disclosures provide information to

the voters. *See Id.* (stating that "[p]roviding information to the electorate is vital

to the efficient functioning of the marketplace of ideas, and thus to advancing the

democratic objectives underlying the First Amendment"). The Court is not

persuaded by Defendants' argument.

Contrary to the above argument, merely labeling an election requirement as

a "disclosure" does not mean that it is a permissible under the First Amendment.

Based on the Court's research, disclosures, in the constitutional sense, are

primarily categorized into two areas. The first involves clarifying the identity of

the speaker in order to inform the public about "who is speaking." *Yamada v.*

*Snipes*, 786 F.3d 1182, 1197 (9th Cir. 2015), cert. denied, *Yamada v. Shoda*, 136

S. Ct. 569 (2015); *see also John Doe No. 1 v. Reed*, 561 U.S. 186, 191 (2010)

(discussing compelled disclosure of the names and addresses of people who signed

referendum petitions).

Second, disclosure often pertains to revealing the source and amount of

political money. *Buckley v. Valeo*, 424 U.S. 1, 66 (1976) (stating that "disclosure

provides the electorate with information as to where political campaign money

comes from and how it is spent by the candidate"). The public policy concerns underlying these categories is often grounded in the need to avoid secrecy in elections. *Brumsickle*, 624 F.3d at 996 (describing the policy behind Washington's political disclosure laws as the avoidance of secrecy). These categories are not anchored to the interest of informing the public about accurate voting records. (Doc. 14 at 13 (Defendants arguing that "[t]he vote-reporting provision is also substantially related to the important interest of providing accurate information to voters").

Because the authority cited by Defendants does not support the contention that exacting scrutiny is the appropriate form of review for vote disclosure laws, the Court is obligated to determine if MCA § 13-35-225(3) should be reviewed under strict scrutiny. *Pest Comm. v. Miller*, 626 F.3d 1097, 1107 (9th Cir. 2010) (providing "that strict scrutiny is applied to a law that burdens core political speech or that imposes severe burdens on plaintiff's rights").

"The First Amendment generally prevents government from proscribing speech." *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 382 (1992) (citations omitted). Further, proscriptions based on the content of the speech "are presumptively invalid." *Id.* (citations omitted). "Government regulation of speech is content based if a law applies to particular speech because of the topic

-23-

discussed or the idea or message expressed." *Reed v. Town of Gilbert, Ariz.*, 135

S. Ct. 2218, 2227 (2015); *see also Am. Civ. Liberties Union of Nevada v. Heller*,

378 F.3d 979, 987 (9th Cir. 2004) (discussing the "distinction between direct

regulation of the content of political speech and requiring the later reporting of the

funding of speech"). Laws that are content based on their face are subject to strict

scrutiny. *Reed*, 135 S. Ct. at 2227. A law survives strict scrutiny only if it is

narrowly tailored to a compelling state interest. *Id.* at 2226.

As a preliminary determination, the Court finds that Montana's vote

disclosure requirement is content based on its face. The Court bases this finding

on the statute's distinction between printed election materials that reference a

candidate's vote and materials that do not. Mont. Code. Ann. § 13-35-225(3).

The statute's vote disclosure requirement, as well as the requirement to provide a

signed statement affirming that the information is accurate and true, are only

triggered by a reference to a candidate's voting record. *Id.* Thus, the statute only

proscribes speech if a certain topic is raised, i.e., a candidate's voting record. This

is a content based restriction and must be reviewed under strict scrutiny. *Reed*,

135 S. Ct. at 2227.

The governmental interest put forward by Defendants is "providing accurate

information to voters." (Doc. 14 at 13.) The Court agrees that this is an important

-24-

interest, and may well be compelling.  However,  even if this interest was

compelling, the means employed by this statute are not narrowly tailored to

achieve this goal.  This finding is anchored primarily in the Court's concerns

about the accessability of this information to the voter.  As conceded at oral

argument, merely referring to a candidate's voting record could require the

submission of a multi-page voting history.  Ironically, speakers would have to mail

this information to the COPP's office in Helena, Montana, even though it was

unclear how the voter would actually access this information.  For a system with a

stated purpose of providing information to the voter, the Court finds that it does

not do it well.  This is in addition to the fact that access to this information already

exists through a publicly supported website.  The Montana Legislature, *Bills*,

http://leg.mt.gov/css/Default.asp (accessed May 19, 2016), *see also United States

v. Alvarez*, 132 S. Ct. 2537, 2551 (2012) (finding that a statute regulating speech

was not necessary when an internet database provided an alternative means to

regulation).  Accordingly, the Court has grave concerns about whether MCA

§ 13-35-225(3) would survive strict scrutiny and finds that Plaintiffs are likely to

succeed on the merits.  The first *Winter* factor thus weighs in favor of an

injunction.

-25-

### ii. Irreparable Harm

"[L]oss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 828 (9th Cir. 2013) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976). As explained above, the Court preliminarily determines that MCA § 13-35-225(3) impermissibly burdens Plaintiffs' First Amendment rights.  Thus, Plaintiffs would suffer irreparable harm should this Court decline to enjoin enforcement of the statute.  Plaintiffs satisfy the second *Winter* factor.

### iii. Balance of Equities

In this case, not granting a preliminary injunction would either subject Plaintiffs to possible prosecution under a law that probably violates their First Amendment rights, or require them to alter their speech and include undesired information in their communications.  In contrast, if the Court enjoined enforcement of MCA § 13-35-225(3), Defendants would merely be prohibited from forcing Plaintiffs to include information in their speech that is readily available on the internet.  The Court finds that the balance of equities leans in favor of the injunction.  Charles Alan Wright, et al., *Federal Practice and Procedure* vol. 11A, § 2948.2, 190–191 (3d ed., West 2005) (stating that "when plaintiff is claiming the loss of a constitutional right, courts commonly rule that

-26-

even a temporary loss outweighs any harm to defendant and that a preliminary injunction should issue").

### iv. Public Interest

Here, the public interest weighs in favor of a preliminary injunction. As stated above, Montana's vote disclosure law most likely violates the First Amendment. In contrast, the focus of this statute is to provide information to the voters. However, this information is not secret and is publically available to the electorate. Thus, should this statute not be enforced, the harm to the public, if any, would be minimal. The public interest weighs in favor of granting an injunction. Because all four *Winter* factors weigh in favor of enjoining MCA § 13-35-225(3), the Court will grant Plaintiffs' motion as to this statute only.

Accordingly, IT IS ORDERED that Plaintiffs' motion (Doc. 3) is GRANTED in part and DENIED in part in accordance with the above order.

Dated this **23rd** day of May, 2016.

Dana L. Christensen, Chief Judge
United States District Court

-27-