**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| NATIONAL ASSOCIATION FOR GUN RIGHTS, INC., <br><br> *Plaintiff-Appellant*, <br><br> v. <br><br> JEFF MANGAN, in his official capacity as the Commissioner of Political Practices for the State of Montana; Timothy G. Fox, in his official capacity as Attorney General for the State of Montana; LEO J. GALLAGHER, in his official capacity as County Attorney for the County of Lewis and Clark, <br><br> *Defendants-Appellees.* | No. 18-35010 <br><br> D.C. No. 6:16-cv-00023-DLC <br><br> OPINION |

Appeal from the United States District Court
for the District of Montana
Dana L. Christensen, Chief District Judge, Presiding

Argued and Submitted March 5, 2019
Portland, Oregon

Filed August 12, 2019

2                                NAGR v. MANGAN

Before:  Susan P. Graber and Marsha S. Berzon, Circuit
Judges, and John R. Tunheim,* District Judge.

Opinion by Judge Berzon

---

**SUMMARY****

---

**Civil Rights**

The panel affirmed in part and reversed in part the
district court's summary judgment in favor of Montana
defendants in an action brought by the National Association
of Gun Rights, a non-profit advocacy group, challenging
Montana's electioneering disclosure laws on First
Amendment grounds.

Under Montana law, an organization that makes an
expenditure of more than $250 on a single electioneering
communication must register as a political committee,
subject to certain organizational and disclosure
requirements.  An electioneering communication is, in part,
a paid communication made within 60 days of the initiation
of voting in an election, that can be received by more than
100 recipients in a voting district and that refers to
candidates, political parties or ballot issues.  Mont. Code
Ann. § 13-1-101(16).   Plaintiff filed suit asserting that the
State's definition of electioneering communication was both

---

* The Honorable John R. Tunheim, Chief United States District
Judge for the District of Minnesota, sitting by designation.

** This summary constitutes no part of the opinion of the court.  It
has been prepared by court staff for the convenience of the reader.

facially overbroad in violation of the First Amendment and unconstitutional as applied to plaintiff. Plaintiff alleged that the First Amendment permits states to require disclosure only of express advocacy and its functional equivalent. Plaintiff asserted that because its proposed mailers did not specifically advocate for or against a specific candidate, but just provided information about a candidate's position on Second Amendment issues, plaintiff could not constitutionally be required to comply with Montana's disclosure requirements.

The panel held that the First Amendment does not limit states' election disclosure requirements solely to regulating express advocacy. The panel reasoned that requiring disclosure of information related to subtle and indirect communications likely to influence voters' votes was critical to the State's interest in promoting transparency and discouraging circumvention of its electioneering laws. Applying exacting scrutiny, the panel held that like the disclosure provisions that were approved in *Human Life of Washington Inc. v. Brumsickle*, 624 F.3d 990, 1016 (9th Cir. 2010) and *Yamada v. Snipes*, 786 F.3d 1182 (9th Cir. 2015), most of Montana's disclosure and related requirements were substantially related to important governmental interests connected with informing the electorate.

The panel held that only Montana's requirement pursuant to §§ 13-37-203, that organizations designate a treasurer registered to vote in Montana, was constitutionally infirm. The panel held that the registered-Montana-voter requirement was not substantially related to any important governmental interest. The panel also held, however, that the registered-voter provision was severable from the rest of the Montana disclosure regime, which could remain in force. The panel therefore affirmed the district court's summary

judgment in favor of Montana except with respect to the treasurer provision.

## COUNSEL

David Warrington (argued), Kutak Rock LLP, Washington, D.C.; Matthew G. Monforton, Monforton Law Offices PLLC, Bozeman, Montana; for Plaintiff-Appellant.

Jere Stuart Segrest (argued) and Matthew T. Cochenour, Assistant Attorneys General; Timothy Fox, Attorney General; Office of the Attorney General, Helena, Montana; for Defendants-Appellees.

Randy Elf, Lakewood, New York, as Amicus Curiae.

## OPINION

BERZON, Circuit Judge:

The National Association of Gun Rights ("NAGR" or "the Association"), a non-profit advocacy group, challenges Montana's electioneering disclosure laws on First Amendment grounds. This appeal treads on familiar territory. In *Human Life of Washington Inc. v. Brumsickle*, 624 F.3d 990, 1016 (9th Cir. 2010) ("*HLW*"), we upheld the State of Washington's disclosure regime, and in *Yamada v. Snipes*, 786 F.3d 1182 (9th Cir. 2015), we rejected challenges to a similar regime in Hawaii. Montana's disclosure regulations closely resemble those of these other states.

Like the disclosure provisions we approved in *HLW* and *Yamada*, most of Montana's disclosure and related requirements are substantially related to important governmental interests connected with informing the electorate. Only Montana's requirement that organizations designate a treasurer registered to vote in Montana is constitutionally infirm. We therefore affirm the district court's summary judgment in favor of Montana except with respect to that provision.

## I

### A

NAGR is a tax-exempt non-profit organization under 26 U.S.C. § 501(c)(4); its principal place of business is in Colorado. NAGR's articulated mission is to "defend the right to keep and bear arms, and advance that God-given Constitutional right by educating the American people and urging them to action in the public policy process." NAGR reports that it has approximately 36,000 members and supporters in Montana and 4.5 million members nationwide. To retain its federal tax status, NAGR cannot engage in "direct or indirect participation or intervention in political campaigns on behalf of or in opposition to any candidate for public office." 26 C.F.R. § 1.501(c)(4)–1(a)(2)(ii).

As part of its mission, NAGR seeks to "let[] the public know where legislators and governmental officials stand on issues related to the Second Amendment." "[D]uring [the 2020] election cycle," NAGR intends "to mail educational literature to Montanans . . . describing which public officials have supported the rights of citizens to keep and bear arms and engage in lawful self-defense, as well as those who have

not done so."[1] NAGR represents that its proposed future mailer would cost more than $250 to distribute. The Association does not intend to distribute the literature, however, if the literature would be deemed an "electioneering communication," subjecting the organization to disclosure requirements under Montana law.

**B**

In 2015, the Montana State Legislature enacted S.B. 289 ("the Statute"), covering a category of speech, denominated "electioneering communications," with the purpose of "increasing transparency, informing Montanans about who is behind the messages vying for their attention, and decreasing circumvention" of campaign finance laws. The Statute defines "electioneering communication" as follows:

> (a) "Electioneering communication" means a paid communication that is publicly distributed by radio, television, cable, satellite, internet website, newspaper, periodical, billboard, mail, or any other distribution of printed materials, that is made

---

[1] The proposed literature would be similar in content to the material NAGR mailed during a previous election cycle. In 2012, NAGR sent several mailers to residents in Flathead County, Montana, that discussed state Senator Bruce Tutvedt's alleged attempts to "kill" a state bill encouraging gun ammunition manufacturing. The mailer read: "Bruce Tutvedt: Working Against the Flathead's Burgeoning Small-Arms Industry." It further stated, "FACT: Flathead County was poised to get a new smokeless powder plant until Bruce Tutvedt took to the Senate Floor and demanded it be killed. (S.B. 371, 04/13/11 Audio) Now, thanks to Bruce Tutvedt, unemployment in the Flathead is nearly 11% percent." The mailer called on residents to "[c]ontact Bruce Tutvedt right away and **DEMAND** he apologize for killing new manufacturing for Flathead County."

within 60 days of the initiation of voting in an election, that does not support or oppose a candidate or ballot issue, that can be received by more than 100 recipients in the district voting on the candidate or ballot issue, and that:

> (i) refers to one or more clearly identified candidates in that election;
>
> (ii) depicts the name, image, likeness, or voice of one or more clearly identified candidates in that election; or
>
> (iii) refers to a political party, ballot issue, or other question submitted to the voters in that election.

(b) The term does not mean:

> (i) a bona fide news story, commentary, blog, or editorial distributed through the facilities of any broadcasting station, newspaper, magazine, internet website, or other periodical publication of general circulation unless the facilities are owned or controlled by a candidate or political committee;
>
> (ii) a communication by any membership organization or corporation to its members, stockholders, or employees;
>
> (iii) a commercial communication that depicts a candidate's name, image, likeness, or voice only in the candidate's

capacity as owner, operator, or employee of a business that existed prior to the candidacy;

(iv) a communication that constitutes a candidate debate or forum or that solely promotes a candidate debate or forum and is made by or on behalf of the person sponsoring the debate or forum; or

(v) a communication that the commissioner determines by rule is not an electioneering communication.

Mont. Code Ann. § 13-1-101(16).[2]

An organization that makes an expenditure of more than $250 on a single electioneering communication must register as a "political committee."[3] Section 13-1-101(31)(a) defines "political committee" as:

---

[2] Montana Administrative Rule 44.11605(2)(b) defines "the initiation of voting" for purposes of electioneering communications to occur "when absentee ballot packets are mailed." The Commissioner of Political Practices has interpreted "the initiation of voting" date to be 25 days before an election, the date when general absentee ballots are mailed. Mont. Code Ann. § 13-13-205(1)(a)(ii). NAGR contends that the earliest date absentee ballots are mailed is 45 days before an election, when absentee ballots for overseas service members are sent. § 13-13-205(2). For our purposes, we need not determine whether electioneering communications are those made within 85 days of an election or within 105 days.

[3] For clarity, we refer to any money an organization spends, whether on advertisements or donations to a candidate, ballot issue, or another organization, as an "expenditure." We refer to funds an organization receives from any source as a "contribution."

[A] combination of two or more individuals or a person other than an individual who receives a contribution or makes an expenditure:

> (i) to support or oppose a candidate or a committee organized to support or oppose a candidate or a petition for nomination;

> (ii) to support or oppose a ballot issue or a committee organized to support or oppose a ballot issue; or

> (iii) to prepare or disseminate an election communication, an electioneering communication, or an independent expenditure.

Political committees ordinarily must abide by certain organizational requirements.[4] All such organizations must file a registration form with the Commissioner of Political Practices containing an organizational statement and the names and addresses of all officers, § 13-37-201(2)(b); appoint a treasurer registered to vote in Montana, §§ 13-37-201(1), -203; deposit all contributions received and expenditures to be disbursed into a bank authorized to transact business in Montana, § 13-37-205; abide by certain

---

[4] These political committee requirements do not apply, with certain exceptions, to political committees organized to support an issue or campaign in a school district or other special districts comprising "a unit of local government authorized by law to perform a single function or a limited number of functions." Mont. Code Ann. § 13-37-206.

depository requirements, § 13-37-207; and keep up-to-date records of contributions and expenditures, § 13-37-208.

In addition to meeting these organizational requirements, political committees are subject to disclosure requirements depending on their level of political activity. Montana law distinguishes among several types of political committees, § 13-1-101(31)(b), two of which are relevant to this case: "incidental" committees and "independent" committees.[5]

An "incidental committee" is a political committee "not specifically organized or operating for the primary purpose of supporting or opposing candidates or ballot issues but that may incidentally become a political committee by receiving a contribution or making an expenditure." § 13-1-101(23)(a). A prototypical incidental committee is a business that operates continuously. If such a committee makes an expenditure of more than $250, it is considered an incidental political committee under S.B. 289, but only for the election cycle in which it makes a qualifying expenditure. An incidental committee must report to whom it is making expenditures, but it is not required to report from whom it is receiving contributions unless those contributions were solicited or earmarked for a particular candidate, ballot issue, or petition for nomination. § 13-37-232.

An incidental committee must file periodic reports of expenditures and, if applicable, contributions during an election cycle in which it makes an expenditure, so long as it continues to accept qualifying contributions or make

---

[5] Political committees also include "ballot issue committees" and "political party committees." Mont. Code Ann. § 13-1-101(31)(b).

qualifying expenditures.[6] If, however, an incidental committee has terminated all qualifying contribution and expenditure activity for an election cycle, it may file a closing report at any time. § 13-37-226(9). If it does so, the committee need not file any subsequent reports. In practice, if an incidental committee makes only a single expenditure in an election cycle, it can fulfill all registration, reporting, and closing requirements in a single filing of two forms. If an incidental committee makes multiple expenditures, it is required to file reports at the intervals required by law.

An "independent committee" differs from an incidental committee in purpose. It is a political committee "organized for the primary purpose of receiving contributions and making expenditures that is not controlled either directly or indirectly by a candidate and that does not coordinate with a candidate in conjunction with the making of expenditures" except pursuant to certain provisions not relevant here. § 13-1-101(24). An independent committee is subject to more detailed disclosure and reporting requirements than an incidental committee. It must report the source and amount

---

[6] Specifically, an incidental committee making multiple expenditures must file a report on the 90th, 35th, and 12th day preceding the date of an election during an election cycle in which it makes an expenditure. § 13-37-226(5)(a). If an incidental committee receives a qualifying contribution or makes an electioneering communication greater than or equal to $500 within 17 days of an election, the incidental committee must file a report within 2 business days of receiving the contribution or making the electioneering communication. § 13-37-226(5)(b), (c). An incidental committee also must file reports within 20 days after an election and at the close of the calendar year. § 13-37-226(5)(d), (e).

of its contributions, as well as the target and amount of its expenditures. § 13-37-229.

An independent committee must make the required disclosures in the same periodic intervals as an incidental committee. § 13-37-226(4).[7] Like an incidental committee, an independent committee may file closing reports at any time. However, because its primary purpose is to advocate during elections, an independent committee often does not close after an election cycle but instead carries over from one election cycle to the next.

## C

In 2016, NAGR filed suit against several Montana officials and agencies alleging, among other challenges, that the State's definition of "electioneering communication," § 13-1-101(16), is both facially overbroad in violation of the First Amendment and unconstitutional as applied to NAGR.[8] NAGR's primary contention in district court was that the First Amendment, as a categorical matter, permits states to

---

[7] Both incidental and independent committees must file more frequent reports if they receive a contribution or make an expenditure "supporting or opposing a candidate . . . or a statewide ballot issue." § 13-37-226(1)–(3). The timing of such reports depends on whether the candidate or ballot issue in question is statewide, district, or local. *Id.*

[8] NAGR brought two other claims: Claim 1—Declaratory and injunctive relief preventing the Commissioner from prosecuting NAGR for educational mailings it made in 2012; and Claim 3—Declaratory and injunctive relief preventing the Commissioner from enforcing the compelled-vote-reporting provision of Montana Code Annotated section 13-35-225(3)(a). On cross-motions for summary judgment, the district court denied NAGR's first claim as time barred and granted NAGR summary judgment on the third claim, holding § 13-35-225(3)(a) unconstitutional. Neither claim is at issue in this appeal.

require disclosure only of express advocacy and its functional equivalent, defined as speech "susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." *FEC v. Wis. Right To Life, Inc.*, 551 U.S. 449, 470 (2007) ("*WRTL*"). NAGR asserted that because its proposed mailers did not specifically advocate for or against a specific candidate, but just provided information about a candidate's position on Second Amendment issues, the Association could not constitutionally be required to comply with Montana's disclosure requirements.

The district court rejected this contention. It granted summary judgment to Montana on NAGR's electioneering communication claim, holding that the "electioneering communication" definition was not constitutionally overbroad. The court reasoned that NAGR's argument was foreclosed by *HLW*, 642 F.3d at 1016, which, said the district court, "reject[ed] [the] contention that . . . disclosure requirements must be limited to speech that is the functional equivalent of express advocacy." Applying exacting scrutiny, the district court held that Montana's interests in "increasing transparency, informing Montanans about who is behind the messages vying for their attention, and decreasing circumvention" are important governmental interests, and that Montana's disclosure requirements are substantially related to those interests because "they are tailored to the degree of an organization's political activity." In support of its determination, the court noted that NAGR would likely need only to register as an incidental committee, a minimal burden, and that the Montana law's disclosure requirements are further tailored because the requirements are limited to a communication that costs more than $250 and is made within a few months before an election.

This appeal followed. We review de novo the district court's grant of summary judgment. *See Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497 (9th Cir. 2015).

## II

### A

The First Amendment, made applicable to the states through the Fourteenth Amendment, forbids the enactment of any law "abridging the freedom of speech." U.S. Const. amend. I. Political speech lies at the core of speech protected by the First Amendment, as it is the means by which citizens disseminate information, debate issues of public importance, and hold officials to account for their decisions in our democracy. "The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." *Citizens United v. FEC*, 558 U.S. 310, 339 (2010). Thus, "[t]he First Amendment 'has its fullest and most urgent application' to speech uttered during a campaign for political office." *Id.* (quoting *Eu v. S.F. Cty. Democratic Cent. Comm.*, 489 U.S. 214, 223 (1989)).

Generally, "[l]aws that burden political speech are 'subject to strict scrutiny'"—that is, they must be narrowly tailored to further a compelling government interest. *Citizens United*, 558 U.S. at 340 (quoting *WRTL*, 551 U.S. at 464). But regulations directed only at *disclosure* of political speech are subject to somewhat less rigorous judicial review—"exacting scrutiny," which requires the government to show that the challenged laws are "substantially related to a sufficiently important governmental interest." *HLW*, 624 F.3d at 1005.

This difference derives from the principle that "the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." *Davis v. FEC*, 554 U.S. 724, 744 (2008). The two types of regulation—expenditure and contribution limitations on the one hand and disclosure requirements on the other—have different effects. Expenditure and contribution limitations "necessarily reduce[] the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached." *Buckley v. Valeo*, 424 U.S. 1, 19 (1976) (per curiam). By contrast, "[d]isclaimer and disclosure requirements may burden the ability to speak, but they 'impose no ceiling on campaign-related activities' and 'do not prevent anyone from speaking.'" *Citizens United*, 558 U.S. at 366 (quoting *Buckley*, 424 U.S. at 64; *McConnell v. FEC*, 540 U.S. 93, 201 (2003)). Far from restricting speech, electioneering disclosure requirements reinforce democratic decisionmaking by ensuring that voters have access to information about the speakers competing for their attention and attempting to win their support. "[T]he people in our democracy are entrusted with the responsibility for judging and evaluating the relative merits of conflicting arguments. They may consider, in making their judgment, the source and credibility of the advocate." *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 791–92 (1978) (footnote omitted). Recognizing the important information-enhancing role that disclosure laws play, the Supreme Court and our court have subjected laws requiring speakers to disclose information in the electoral context to a somewhat less demanding standard than strict scrutiny, described as "exacting scrutiny." *See Doe v. Reed*, 561 U.S. 186, 196 (2010) (collecting cases).

**B**

NAGR's primary argument—that the First Amendment, as a categorical matter, permits states to require disclosure only with respect to express advocacy—has been rejected by both the Supreme Court and this court.[9] In *Wisconsin Right To Life*, the Supreme Court limited federal *restrictions* on independent campaign expenditures to express advocacy and its functional equivalent. *WRTL*, 551 U.S. at 469–70. But *Citizens United* declined to impose the same categorical limitation on *disclosure* requirements. 558 U.S. at 369. There, the Court upheld a federal law requiring certain electioneering communications to include a disclaimer by the organization that funded the communication.

The electioneering communications at issue in *Citizens United* were television advertisements promoting a movie about then-presidential candidate Hillary Clinton. The advertisements were not the functional equivalent of express advocacy. "They referred to then-Senator Clinton by name shortly before a primary and contained pejorative references

---

[9] Neither party contests that NAGR's intended electioneering materials are likely electioneering communications covered by Montana law, subjecting NAGR to prosecution if it does not comply with Montana's requirements. NAGR's decision—not to distribute for fear of prosecution, election material it would have distributed if the challenged laws had not been enacted—is sufficient to establish standing. In the First Amendment context, "self-censorship" is "a harm that can be realized even without an actual prosecution." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988). So long as the "intended speech arguably falls within the [challenged] statute's reach," refraining from that speech to avoid disclosure requirements, where speaking without disclosure could lead to prosecution, is a constitutionally sufficient injury. *HLW*, 624 F.3d at 1000–01 (quoting *Cal. Pro-Life Council Inc. v. Getman*, 328 F.3d 1088, 1095 (9th Cir. 2003)).

to her candidacy," but they did not expressly advocate support or opposition for her candidacy. *Id.* at 368.**[10]** Nonetheless, the Court upheld the disclaimer requirements. Rather than rely on a rigid distinction between express advocacy and issue advocacy, the Court reasoned that the "[t]he disclaimers . . . provide the electorate with information and insure that the voters are fully informed about the person or group who is speaking" *Id.*(citations and alterations omitted).

We relied on this holding in *HLW*. 624 F.3d at 1016. Citing *Citizens United*, we declined to recognize "a bright-line rule distinguishing express and issue advocacy" and "reject[ed] [the] contention that the disclosure requirements must be limited to speech that is the functional equivalent of express advocacy." *Id.* (quoting *Citizens United*, 558 U.S. at 369).

NAGR cites the Seventh Circuit's decision in *Wisconsin Right to Life, Inc. v. Barland*, 751 F.3d 804 (7th Cir. 2014) ("*Barland*"), to support its contention that electioneering disclosure laws may constitutionally apply only to express advocacy. We necessarily rejected that proposition in *HLW*. Other circuits agree with *HLW* on this point. "*Citizens United* made clear that the wooden distinction between express advocacy and issue discussion does not apply in the disclosure context." *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 484 (7th Cir. 2012); accord *Vt. Right to Life Comm., Inc. v. Sorrell*, 758 F.3d 118, 132 (2d

---

**[10]** The Court held that the film itself constituted express advocacy, 558 U.S. at 325, but did not so determine with respect to the advertisements for the film.

Cir. 2014); *Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 54 (1st Cir. 2011).

Considered as a whole, *Barland*'s reading of *Citizens United* is not to the contrary. That decision asserted that the Court's holding in *Citizens United* regarding disclosure requirements did not "suggest[] that the Court was tossing out the express-advocacy limitation for *all* disclosure systems" and cautioned that "it's a mistake to read *Citizens United* as giving the government a green light to impose political-committee status on every person or group that makes a communication about a political issue that also refers to a candidate." *Barland*, 751 F.3d at 836–37. In context, when *Barland* stated that *Citizens United* "applies only to the specifics of the disclosure requirement at issue there," *id*. at 836, it was offering a contrast between narrowly tailored and sweeping disclosure requirements, *id*. at 837, not determining that even appropriately tailored disclosure laws, such as the one considered in *Citizens United*, may apply only to express advocacy.

Montana's disclosure requirements for political speech that mentions a candidate or ballot initiative in the days leading up to an election reflect the unremarkable reality that such speech—express advocacy or not—is often intended to influence the electorate regarding the upcoming election. That NAGR intends specifically to send out its mailers "during this election cycle" reveals its own belief that such communications are more relevant to voters in the days before an election. To paraphrase *HLW*, "[f]or the same reasons that [NAGR] had a heightened interest in speaking about [Second Amendment rights] during the run-up to the . . . vote, [Montanans] had a heightened interest in knowing who was trying to sway their views on the topic and how much they were willing to spend to achieve that goal."

624F.3d at 1019. Requiring disclosure of information related to subtle and indirect communications likely to influence voters' votes is critical to the State's interest in promoting transparency and discouraging circumvention of its electioneering laws.

In sum, the First Amendment does not limit states' election disclosure requirements solely to regulating express advocacy. Rather, we apply exacting scrutiny in determining the validity of election disclosure requirements covering electioneering communications.

## C

NAGR also submits that, even if exacting scrutiny applies,[11] Montana's disclosure regime for electioneering communications cannot stand.[12] Not so.

This is not the first time we have addressed the constitutionality of electioneering communication disclosure requirements under exacting scrutiny. Both *HLW* and *Yamada* upheld disclosure regimes similar to the one at

---

[11] NAGR acknowledges that, if electioneering communication disclosure requirements for issue advocacy are permitted at all, exacting scrutiny—not strict scrutiny—applies. Before *HLW*, there was some confusion in this circuit as to whether electioneering disclosure laws are subject to exacting scrutiny or strict scrutiny. *See HLW*, 624 F.3d at 1003–05. *HLW* clarified that exacting scrutiny is the correct standard. *Id*.

[12] NAGR maintains that it is challenging only the overbreadth of the term "electioneering communications" and not the accompanying disclosure requirements. This attempt at delicately parsing NAGR's claim is of no help. The constitutionally permissible scope of the term "electioneering communications" depends on the disclosure burdens that attach when a speaker makes such a communication.

issue in this case. With one exception, Montana's requirements are sufficiently parallel to those in *HLW* and *Yamada* that those precedents control here.

*HLW* addressed a challenge to the State of Washington's laws requiring public disclosures for organizations engaging in various types of political speech. Under Washington law, an organization engaged in limited political advocacy is required to disclose only its "independent expenditures" and "political advertising." *Id*. at 998. Such an organization must identify the target of its expenditures on a monthly basis so long as it continues to make expenditures, but generally need not disclose the source of its contributions. *Id*. at 998–99.

On the other hand, the Washington disclosure statute requires an organization that has as its "'primary or one of the primary purposes' to 'affect, directly or indirectly, governmental decision making by supporting or opposing candidates or ballot propositions'" to fulfill more significant requirements by registering as a "political committee." *Id*. at 997 (quoting *Evergreen Freedom Found. v. Wash. Educ. Ass'n*, 49 P.3d 894, 903 (Wash. Ct. App. 2002)). A political committee must file ongoing reports disclosing the sources of its expenditures and contributions. *Id*. at 998. The frequency of reporting for both types of organizations in Washington is pegged to fixed intervals before an election. *Id*. at 998–99.

In *HLW*, a non-profit organization, Human Life of Washington Inc., sought to distribute material opposing physician-assisted suicide shortly before a state ballot initiative vote to legalize such conduct in Washington. *Id*. at 995, 1014. Applying exacting scrutiny, we determined that Washington's interest in "[p]roviding information to the electorate" is a sufficiently important interest to justify Washington's disclosure requirements, because the

requirements "help[ed] ensure that voters have the facts they need to evaluate the various messages competing for their attention" and make informed electoral choices. *Id*. at 1005.

*HLW* went on to hold that the State's disclosure requirements are substantially related to that important interest. *Id*. at 1012, 1018. With respect to the political committee requirements, we reasoned that Washington's disclosure requirements are appropriately scaled to the level of political advocacy in which an organization engages. The scaling "ensures that the electorate has information about groups that make political advocacy a priority, without sweeping into its purview groups that only incidentally engage in such advocacy." *Id*. at 1011. *HLW* also determined that Washington's political committee disclosure requirements are not overly burdensome relative to the government's interests. *Id*. at 1013. Such requirements are triggered only if a committee spends above a certain annual threshold and involve only a two-page registration form, along with three additional reports pegged to the election in which the organization is engaging. *Id*. And, with respect to the independent expenditures and political advertising requirements, *HLW* concluded that those requirements are substantially related to the interest in informing the electorate, because they (1) "target only those expenditures and advertisements made in conjunction with an ongoing election or vote," and (2) "once the initial two-page registration form is filed, the filing of additional special reports is pegged to the dates of the upcoming election." *Id*. at 1018.

*Yamada* addressed issues closely similar to those in *HLW*, this time rejecting an as-applied challenge to election disclosure laws in Hawaii. While doing so, *Yamada*

reaffirmed the First Amendment principles established in *HLW*. 786 F.3d 1182.

Under Hawaii law, an organization with "'the purpose' of making or receiving contributions, or making expenditures, for communications or activities that constitute express advocacy or its functional equivalent" that receives contributions or makes certain expenditures in excess of $1000 over a two-year election period must register as a "noncandidate committee." *Id*. at 1194–95. A noncandidate committee must provide identifying information about its organization, maintain records for five years, and keep a segregated bank account for the committee's contributions. *Id*. at 1195. In addition, a noncandidate committee is required to disclose its contributions and expenditures at intervals tied to each election cycle and to file annual reports. *Id*. Organizations that do not qualify as noncandidate committees in Hawaii need only include disclosures in certain "electioneering communications," such as advertising that identifies a candidate and advocates or opposes the election of that candidate. *Id*. at 1202.

*Yamada* upheld both Hawaii's noncandidate committee disclosure requirements and its electioneering communication disclosure requirements. With respect to the noncandidate committee requirements, *Yamada* held that the requirements are "materially indistinguishable" from the disclosure requirements at issue in *HLW*. In so holding, *Yamada* reasoned that, because the requirements do not apply to organizations engaged in incidental advocacy and trigger reporting requirements only at a $1,000 threshold, they are adequately tailored to the governmental interests underlying them. *Id*. at 1195, 1198–99. With respect to electioneering communications, *Yamada* noted that

Hawaii's disclaimer requirements track the federal disclaimer requirements upheld in *Citizens United*. *Id*. at 1201–03.

Taken together, *HLW* and *Yamada* indicate that electioneering disclosure laws that survive exacting scrutiny under the First Amendment exhibit certain broad features. These features are apparent in all but one component of Montana's disclosure requirements.

*First*, such laws further the "important" interests of "providing the electorate with information, deterring actual corruption and avoiding any appearance thereof, and gathering the data necessary to enforce more substantive electioneering restrictions." *Yamada*, 786 F.3d at 1197 (quoting *Canyon Ferry Rd. Baptist Church of E. Helena, Inc. v. Unsworth*, 556 F.3d 1021, 1031 (9th Cir. 2009)); *see also Citizens United*, 558 U.S. at 369; *McConnell*, 540 U.S. at 196; *HLW*, 624 F.3d at 1008. Knowing shortly before an election who is speaking and how much they are spending "enables the electorate to make informed decisions and give proper weight to different speakers and messages." *Citizens United*, 558 U.S. at 371.

Montana's disclosure regime furthers identical interests. Montana's interests in "increasing transparency, informing Montanans about who is behind the messages vying for their attention, and decreasing circumvention" of campaign finance laws are sufficiently important to justify election disclosure requirements. *See Citizens United*, 558 U.S. at 369; *McConnell*, 540 U.S. at 196; *Yamada*, 786 F.3d at 1197; *HLW*, 624 F.3d at 1008.

*Second*, the substantive information organizations must disclose under valid electioneering laws usually varies with the type and level of an organization's political advocacy.

Organizations that frequently engage in political speech can be required to disclose more information than organizations that do so only occasionally. When measuring an organization's level of political advocacy, these statutes often use purpose as a proxy. For example, the Washington disclosure laws upheld in *HLW* require organizations with "a primary purpose of political advocacy" to disclose the source and amount of both contributions and expenditures; organizations without such a purpose must disclose only the source and amount of expenditures. 624 F.3d at 998–99. Similarly, the Hawaii laws upheld in *Yamada* require organizations with "'the purpose' of . . . [engaging in] express advocacy or its functional equivalent" to disclose information about both contributions and expenditures, 786 F.3d at 1194–95; organizations having no such purpose but engaging in occasional political advertising are required to include only a disclaimer within the advertisement itself, concerning whether a candidate endorsed the particular advertisement, *id.* at 1202. Variance in substantive reporting requirements for different levels of political advocacy activity "ensures that the electorate has information about groups that make political advocacy a priority, without sweeping into its purview groups that only incidentally engage in such advocacy." *HLW*, 624 F.3d at 1011.

Montana's disclosure regime similarly imposes reporting burdens commensurate with an organization's level of political advocacy. Montana has a two-tiered reporting structure, like the Washington regime affirmed in *HLW*. *Id.* Independent committees, which have the "primary purpose of receiving contributions and making expenditures" to support a candidate or ballot initiative, or make electioneering communications, Mont. Code Ann. § 13-1-101(24), are subject to more substantial requirements than incidental committees, which do not have such a

primary purpose, § 13-1-101(23)(a). Independent committees must report both contributions received and expenditures made, § 13-37-229; incidental committees need only report expenditures, unless their contributions were solicited or earmarked for a particular candidate, ballot issue, or petition for nomination, § 13-37-232.[13]

*Third*, in valid electioneering disclosure laws, the frequency of required reporting does not extend indefinitely to all advocacy conducted at any time but is tied to election periods or to continued political spending. During an election period, reporting is for the most part limited to reasonable intervals in the days leading up to an election and shortly thereafter. *Yamada* upheld a requirement to file reports ten days before any election, twenty days after a primary election, and thirty days after a general election. 786 F.3d at 1195. Similarly, *HLW* upheld a requirement to file reports on the twenty-first day before an election, the seventh day before an election, and the tenth day of the first month after an election. 624 F.3d at 998, 1013.

Less extensive reporting requirements are imposed on organizations that receive contributions or make expenditures outside an election period, *see Yamada*, 786 F.4d at 1195; *HLW*, 624 F.3d at 1013, or on

---

[13] In this respect, Montana's disclosure regime is distinguishable from the Wisconsin regime invalidated in *Barland*, the Seventh Circuit case that NAGR cites to support its position. 751 F.3d 804. The disclosure requirements there did not vary with an organization's level of political advocacy. Groups engaged in express advocacy and those engaged in issue advocacy were subject to the same reporting requirements. *Id.* at 837. So were organizations with a major purpose of political advocacy and those that incidentally engaged in such advocacy. *Id.* at 841–42.

organizations that stop making expenditures in the middle of an election period, *see Yamada*, 786 F.3d at 1195; *HLW*, 624 F.3d at 1018–19.**[14]** These requirements reflect "the unique importance of the temporal window immediately preceding a vote," when speech is more likely to be perceived as related to an election and the public is more likely to pay attention to and be affected by such speech. *HLW*, 624 F.3d at 1019.

Montana's reporting requirements are similarly tied with precision to specific election periods. For organizations that make electioneering communications, such as NAGR, only a communication made "within 60 days of the initiation of voting in an election" triggers the requirement to register as a political committee. § 13-1-101(16). Once an organization registers as a political committee, it usually must file disclosure reports at intervals preceding and shortly after an election, as well as at the end of the calendar year. § 13-37-226(4), (5). Committees that receive contributions or make expenditures "supporting or opposing a candidate . . . or ballot issue" must file more frequent reports. § 13-37-226(1)-(3). If a committee terminates qualifying contributions and expenditure activity for an election cycle, it may file a "closing report" at any time, relieving it of subsequent reporting obligations. § 13-37-226(9). A committee making a single expenditure in an election cycle

---

**[14]** Other circuits have struck down reporting requirements that mandate reporting after an organization stops making expenditures in the middle of an election period. *See Minn. Citizens Concerned for Life, Inc. v. Swanson*, 692 F.3d 864, 873–74 (8th Cir. 2012) (en banc) (enjoining Minnesota's reporting requirements, which continued to apply after an organization ceased further expenditures); *Iowa Right to Life Comm., Inc. v. Tooker*, 717 F.3d 576, 596–98 (8th Cir. 2013) (striking down Iowa's ongoing reporting requirements, which were not tethered to any future political spending).

can thus fulfill all registration, reporting, and closing requirements in one filing of two forms. Montana's reporting requirements are therefore carefully tailored to pertinent circumstances, distinguishing them from one-size-fits-all disclosure regimes that other circuits have invalidated. *See Swanson*, 692 F.3d at 873–74; *Tooker*, 717 F.3d at 596–98.

*Fourth*, disclosure laws specifying a monetary threshold at which contributions or expenditures trigger reporting requirements ensure that the government does not burden minimal political advocacy. The acceptable threshold for triggering reporting requirements need not be high. In Hawaii, the threshold was raising or spending more than $1,000 during a two-year election cycle. *Yamada*, 786 F.3d at 1195. In Washington, the threshold was raising or spending more than $5,000, or raising more than $500 from a single donor. *HLW*, 624 F.3d at 1013.

Once reporting requirements are triggered, states may constitutionally mandate disclosure of even small contributions. *Family PAC v. McKenna*, 685 F.3d 800, 809 (9th Cir. 2012), for example, upheld requirements that organizations disclose the names and addresses of contributors donating more than $25 and reveal the employer and occupation of contributors giving more than $100. "[K]nowing the source of even small donations is informative in the aggregate and prevents evasion of disclosure." *Worley v. Fla. Sec'y of State*, 717 F.3d 1238, 1251 (11th Cir. 2013); *see also Buckley*, 424 U.S. at 82–84 (upholding a requirement that organizations keep records of all contributions in excess of $10 and report contributions in excess of $100).

Montana's disclosure regime imposes requirements only on organizations that make an expenditure of more than $250 to disseminate a single electioneering communication,

§ 13-1-101(31)(d), ensuring that disclosure requirements do not burden minimal political activity. This threshold is within the range of constitutionally acceptable reporting thresholds. *See. e.g.*, *McKee*, 649 F.3d at 59–60 (upholding a $100 contribution threshold); *Yamada*, 786 F.3d at 1195 (upholding a threshold of $1,000 during a two-year election cycle); *HLW*, 624 F.3d at 1013 (upholding a threshold of $5,000 during an election cycle or $500 from a single donor).

*Finally*, disclosure laws may impose certain adjunct requirements on political speakers, to enable "gathering the data necessary to enforce more substantive electioneering restrictions." *Yamada*, 786 F.3d at 1197 (quoting *Canyon*, 556 F.3d at 1031). An organization may be required to "designate officers, disclose its bank account information, and designate a treasurer responsible for recording contributions and expenditures and maintaining records for five years," *id.* at 1195, as well as to file a short registration form containing "the organization's name, relationship with other organizations, and persons with authority over the organization's finances," *HLW*, 624 F.3d at 1013.

Most of Montana's disclosure-related registration requirements are similar to, and no more onerous than, those we upheld in *HLW*, 624 F.3d at 1013, and in *Yamada*, 786 F.3d at 1195. Qualifying political committees need to file a two-page registration form with the State containing basic identification information, § 13-37-201(3), appoint a treasurer, § 13-37-201(1), abide by certain bank depository requirements, §§ 13-37-205, -207, and keep current records of contributions and expenditures, § 13-37-208. *See, e.g.*, *HLW*, 624 F.3d at 997 (noting bank and treasurer requirements). Like the obligations in *HLW* and *Yamada*, these obligations "require little more if anything than a prudent person or group would do in these circumstances

anyway." *Worley*, 717 F.3d at 1250; *see also SpeechNow.org v. FEC*, 599 F.3d 686, 697 (D.C. Cir. 2010) (en banc) (upholding "organizational requirements ... such as designating a treasurer and retaining records").

In short, almost all of Montana's disclosure requirements share the features that *HLW* and *Yamada* have highlighted as markers of valid disclosure laws and so withstand exacting scrutiny. *Yamada*, 786 F.3d at 1195. [15]

## D

NAGR suggests that, even if *HLW* and *Yamada* otherwise support upholding Montana's electioneering disclosure requirements, Montana's requirements governing the disclosure of issue advocacy during candidate elections are inconsistent with *HLW*.

*HLW* did note that "there is less of a danger of a regulation sweeping too broadly in the context of a ballot measure than in a candidate election," because "the only issue advocacy that could potentially be regulated is

---

[15] We do not suggest that disclosure laws with different features than those described above would not survive exacting scrutiny. Rather, these are features of statutes that do survive such scrutiny. Election disclosure schemes are often varied and complex, imposing different requirements on different categories of speakers.

For example, an election disclosure regime could embody these broad principles but, in its details, impose overly onerous requirements. Conversely, legislatures have some discretion to define the precise details of each scheme—for example the specific dollar threshold that triggers disclosure requirements. "[D]isclosure thresholds ... are inherently inexact; courts therefore owe substantial deference to legislative judgments fixing these amounts." *Family PAC*, 685 F.3d at 811.

advocacy regarding the single issue put before the public." *HLW*, 624 F.3d at 1018 (emphasis omitted) (internal quotation marks omitted). In making that distinction, *HLW* reasoned that, "[i]n the ballot initiative context, . . . where express and issue advocacy are arguably 'one and the same,' any incidental regulation of issue advocacy imposes more limited burdens that are more likely to be substantially related to the government's interests." *Id*.

*HLW*'s discussion was of relevant differences between ballot initiatives and candidate elections that *could* matter in some—but not all—circumstances. In the end, though, *HLW* rejected both a facial and an as-applied challenge to Washington's disclosure requirements generally. *Id*. at 994–95. Those requirements covered both candidate and ballot initiative elections. *Id*. at 997–99. We observed in *HLW* that the "disclosure obligations do not apply absent a pending *election or ballot initiative campaign*," *id*. at 1018 (emphasis added), and thus concluded that Washington's tailored disclosure regulations were not overbroad as applied to candidate elections.

*Yamada*, decided after *HLW*, upheld Hawaii's election disclosure regime as applied to a corporation that contributed money to candidate campaigns and bought advertisements criticizing a candidate. Examining Hawaii's carefully tailored disclosure requirements for electioneering communications, *Yamada* suggested no distinction between candidate and ballot initiative elections for First Amendment purposes. *See* 786 F.3d at 1185–86.

Similarly, Montana's tailored disclosure regime for electioneering communications does not violate the First Amendment simply because it covers candidate elections. As explained, the components of Montana's disclosure regime are—with the exception we next discuss—closely

parallel to those upheld in *HLW* and *Yamada*. And, like the disclosure regulations in those cases, Montana's requirements are substantially related to important governmental interests as applied both to candidate and to ballot initiative elections.

### III

One of Montana's registration requirements does raise serious First Amendment concerns. In addition to imposing the registration requirements already mentioned, Montana mandates that a political committee's designated treasurer be a registered Montana voter. § 13-37-203. To register as a Montana voter, an individual must be at least 18 years of age, a resident of Montana for at least 30 days, a United States citizen, not currently incarcerated for a felony, and of sound mind. § 13-1-111. This registered-Montana-voter requirement is not, we hold, substantially related to any important governmental interest.

Montana's registered-voter requirement is subject to exacting scrutiny, not strict scrutiny. True, the requirement does not, on its own, mandate registration or disclosure. Rather than require that a speaker provide particular information about itself or its activities, it imposes a requirement on how an organization engaged in electioneering communication must be structured. The requirement is, however, a predicate to enforcement of a broader disclosure regime.

Our precedents addressing the constitutionality of state electioneering disclosure regimes have subjected to exacting rather than strict scrutiny the *entire* disclosure regime, including provisions that do not themselves require registration or disclosure. *Yamada*, for example, analyzed under exacting scrutiny, and upheld, laws requiring covered

entities to maintain records of their contributions and expenditures. 786 F.3d at 1195. *HLW* approved the requirement that political committees open bank accounts in the state in which they are speaking. 624 F.3d at 997. Our sister circuits have similarly so held. *See Worley*, 717 F.3d at 1249 (upholding under exacting scrutiny "[o]ther requirements, such as requiring a treasurer, segregated funds, and record-keeping" (internal quotation marks omitted)); *Sorrell*, 758 F.3d at 137 (characterizing "registration, recordkeeping necessary for reporting, and reporting requirements" as a single "disclosure regime" subject to exacting scrutiny); *SpeechNow.org*, 599 F.3d at 697–98 (upholding under exacting scrutiny "organizational requirements . . . such as designating a treasurer and retaining records" ). Montana's registered voter requirement resembles the types of organizational requirements that we and other circuits have analyzed under exacting scrutiny.

Reviewing Montana's registered voting requirement under exacting scrutiny is consistent with precedents in which strict scrutiny was applied. *Nader v. Brewer*, 531 F.3d 1028 (9th Cir. 2008), for example, reviewed an Arizona requirement that circulators of candidate nomination petitions be residents of that state, *id.* at 1036, concluding that strict scrutiny was compelled by the Supreme Court's decision in *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 194–95 (1999). *Buckley* invalidated a Colorado law requiring that circulators of ballot initiative petitions be registered voters. As *Nader* noted, "[t]he Court held in *Buckley* that significantly reducing the number of potential circulators imposed a severe burden on rights of political expression." *Nader*, 531 F.3d. at 1036. Inferring from *Buckley* that laws severely burdening speech rights must be subject to strict scrutiny, *Nader* concluded that the

Arizona residency requirement was subject to strict scrutiny because it "exclude[d] from eligibility all persons who support the candidate but who . . . live outside the state of Arizona." *Id.*

Montana's registered-voter requirement is significantly less burdensome than the requirements at issue in *Buckley* and *Nader*. The particular First Amendment harm that restrictions on petition circulators pose is that they "limit the number of voices who will convey the initiative proponents' message and, consequently, cut down the size of the audience proponents can reach." *Buckley*, 525 U.S. at 194–95 (alterations and citations omitted). No similar limitation on the audience reached is here at issue: Montana requires only that a *single* individual be a registered Montana voter—a political committee's treasurer. So long as an organization can find one such treasurer, the size of the audience it can reach will not be limited.

So, given the limited burden on a political committee's speech imposed by Montana's registered-voter requirement, we apply exacting rather than strict scrutiny to determine its validity. But we conclude anyway that the registered voter requirement does not significantly forward the interests it is said to advance and so violates the First Amendment.

Addressing the connection between the registered-voter requirement and the goals of its disclosure scheme, Montana asserts that the registered voter requirement is "shorthand" for the prerequisites that being a registered Montana voter entails—being at least 18, of sound mind, a Montana resident, and not an incarcerated felon. Such types of prerequisites can be substantially related to Montana's important interest in identifying representatives of political committees who can be held accountable for violations of

electioneering laws.[16] For example, the State has a strong interest in assuring that it can subpoena treasurers of political committees, and only individuals within the state can be subpoenaed. Mont. Code. Ann. § 46-15-107.

But an individual can meet all the prerequisites for registering to vote yet not register. Montana could have made appropriate prerequisites for registration the conditions for serving as treasurer without requiring registration itself. Montana identifies no interest served by excluding potential treasurers who are not registered voters but could be if they chose. We cannot identify any such interest either. And none of the disclosure regimes we have upheld have included such a registration requirement. *Yamada*, 786 F.3d at 1195 (citing Haw. Rev. Stat. § 11-324); *HLW*, 624 F.3d at 997 (citing Wash. Rev. Code § 42.17.050(1)).

An out-of-state organization like NAGR, which has its principal place of business in Colorado, may not have any members qualified to be designated as a treasurer *and* registered to vote in Montana. By imposing the voter registration qualification that it does, the state burdens the speech rights of such organizations without any justification and so violates the First Amendment.

But that single invalid provision certainly does not mean that the entire disclosure statute falls. The registered-voter provision is definitely severable from the rest of the Montana disclosure regime.

---

[16] We do not address whether the details of Montana's prerequisites for voter registration—such as the 30-day Montana residency requirement—are permissible conditions for being a treasurer of a political committee.

"Severability is a matter of state law." *Sam Francis Found. v. Christies, Inc*., 784 F.3d 1320, 1325 (9th Cir. 2015) (en banc) (alterations and quotations omitted). Under Montana law:

> [I]f a statute contains both constitutional and unconstitutional provisions, we examine the legislation to determine if there is a severability clause. The inclusion of a severability clause in a statute is an indication that the drafters desired a policy of judicial severability to apply to the enactment. If a statute does not contain a severability clause, we still may sever an unconstitutional provision. In doing so, we must determine whether the unconstitutional provisions are necessary for the integrity of the law or were an inducement for its enactment. In order to sever an unconstitutional provision, the remainder of the statute must be complete in itself and capable of being executed in accordance with the apparent legislative intent. That is, if severing the offending provisions will not frustrate the purpose or disrupt the integrity of the law, we will strike only those provisions of the statute that are unconstitutional.

*State v. Theeler*, 385 P.3d 551, 553–54 (Mont. 2016) (citations and internal quotation marks omitted).

The statute that first enacted the requirement that committee treasurers must be registered Montana voters contained a severability provision, *see* 1975 Mont. Laws 1250, 1265, but a later amendment did not, *see* 1977 Mont.

Laws 108. But "[w]ith or without severability clauses in each amendment since the statute's enactment, we conclude that the unconstitutional provision is unnecessary for the integrity of the law." *Theeler*, 385 Mont. at 474 (quotation marks omitted). Without the registered voter requirement, a political committee would still be required to designate a committee treasurer, fulfill registration requirements, and keep records of its contributions and expenditures. Mont. Code Ann. §§ 13-37-201, -208. Montana would still be able to gather the identifying information necessary to enforce its substantive campaign finance laws, as evidenced by other state electioneering disclosure regimes that do not require treasurers to register in their state. *See Yamada*, 786 F.3d at 1195; *HLW*, 624 F.3d at 997.

In short, the remainder of the electioneering disclosure regime could still be "executed in accordance with the apparent legislative intent" of the law. *Theeler*, 385 P.3d at 554 (internal quotation marks omitted). We hold that, despite the invalidity of the registered voter provision, the rest of Montana's disclosure scheme remains in force.

## IV

In sum, the First Amendment does not limit Montana to regulating only express advocacy. With the exception of its designated-treasurer requirement, all of the other components of Montana's disclosure regime survive exacting scrutiny. Like the disclosure regimes upheld in *HLW* and *Yamada*, Montana's scheme is sufficiently tailored to Montana's interest in informing its electorate of who competes for the electorate's attention and preventing the circumvention of Montana's election laws.

We **AFFIRM** in part and **REVERSE** and **REMAND** in part the district court's summary judgment order. The parties shall bear their own costs on appeal.